J-A18037-16

2016 PA Super 210

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| GABRIEL PIO JESUS SHULL, | |
| Appellee | No. 1607 MDA 2015 |

Appeal from the Judgment of Sentence August 11, 2015
In the Court of Common Pleas of Centre County
Criminal Division at No(s): CP-14-CR-0001772-2014

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| GABRIEL PIO JESUS SHULL, | |
| Appellant | No. 1670 MDA 2015 |

Appeal from the Judgment of Sentence August 11, 2015
In the Court of Common Pleas of Centre County
Criminal Division at No(s): CP-14-CR-0001772-2014

BEFORE: FORD ELLIOTT, P.J.E., BENDER, P.J.E., and Stevens, P.J.E.*

OPINION BY STEVENS, P.J.E.: **FILED SEPTEMBER 13, 2016**

The Commonwealth appeals from the judgment of sentence entered in the Court of Common Pleas of Centre County, Senior Judge Michael Williamson presiding, who, sitting as finder of fact in Gabriel Pio Jesus Shull's ("Shull") non-jury trial, convicted Shull of one count each of Robbery—Fear

*Former Justice specially assigned to the Superior Court.

of Serious Bodily Injury, Unlawful Restraint, Simple Assault, Possessing an Instrument of Crime ("PIC"), and Possession of Drug Paraphernalia.[1] Raised in the Commonwealth's appeal are the contentions that the trial court abused its sentencing discretion in refusing to apply a deadly weapon enhancement, in sentencing Shull below the guideline range, and in modifying Shull's sentence for the sole purpose of changing his place of confinement.

In his cross-appeal, Shull asserts the trial court committed error when it denied his motion to disqualify the District Attorney, failed to transfer his case to juvenile court, denied his objection to the admission of other bad acts evidence, and failed to award credit for pre-trial time served for his voluntary admission in privately run, inpatient rehabilitation facilities. Shull also contends that evidence was insufficient to support his Robbery conviction. After careful review, we affirm Shull's convictions, but we remand for resentencing and caution the trial court to impose sentence in a manner consistent with this decision and in accordance with appropriate law.

This matter stems from then-seventeen year-old Gabriel Shull's conduct during the early morning hours of October 13, 2014, as he drove in Centre County smoking marijuana with a former high school acquaintance, Paul Sepich, who had entered his freshman year at Penn State University.

---

[1] 18 Pa.C.S. §§ 3701(a)(1)(ii), 2902(a)(1), 2701(a)(1), 907(a), and 35 Pa.C.S. § 780-113(a)(32), respectively.

N.T., 6/17/15 at 15-20. Sepich and Shull were not friends in high school, but they had crossed paths very briefly at a mutual friend's house a week earlier, Sepich would later testify at trial. He said he entered Shull's car as it pulled up that night thinking a different "Gabe"—Gabe Sandoval—had phoned and invited him to "smoke weed" and drive around town. *Id.* Despite his surprise at seeing Shull, Sepich remained in Shull's company for the duration of the night.

During the course of the night, Shull made stops at a convenience store and two different Walmart stores. At the North Atherton Walmart, Sepich and Shull walked to the sporting goods department and were looking at pellet guns. According to Sepich's testimony, he told Shull he hoped to buy one of the guns once he saved enough money. N.T., at 34-37. Shull took the box off the shelf and began to tamper with it, prompting Sepich to to disassociate himself with an apparent shoplifting in progress by walking away. *Id.* On cross-examination, Sepich denied the suggestion that he supported the theft by advising Shull to take a gun without an orange tip if he intended to use it for a robbery. N.T., at 80.

Walmart surveillance video admitted at trial captured Shull removing a Daisy CO-2 pellet gun—which replicates an actual handgun—from the box, placing it underneath his clothing, rejoining Sepich in a nearby aisle, and leaving the store without paying. N.T., at 108-09, 112. Lacking a CO-2 cartridge, however, the pellet gun was incapable of firing a pellet that night. N.T., at 116.

At approximately 3:00 a.m., the two were driving in downtown State College as 23 year-old Penn State student Morgan Grego was walking home after she had completed work at a local pub and stopped for groceries. N.T., at 160-162. Carrying grocery bags and her purse, Grego elected to turn down less-traveled Calder Avenue in order to avoid walking by "the drunk students that normally take College Avenue" during the early morning hours. N.T., at 162.

As she walked along Calder toward her residence on South Burrowes Street, Grego noticed two men in a car pull out of a nearby parking deck, drive past her "a little faster than what was appropriate," and turn right onto South Burrowes. N.T., at 181-82. She did not think anything of it at the time, and she continued to walk. Before Grego reached the corner, however, Shull had alighted his vehicle and intercepted her on the pretext that he needed directions to a gas station. N.T., at 162-63.

Grego stopped and pointed the way to the convenience store where she had just been, to which Shull replied "[o]kay, do you think you can spot me some money?" N.T., at 163. Feeling uncomfortable, Grego answered "no" and attempted to walk away, but Shull, with his hands remaining in his hoodie pocket, blocked her path. N.T., at 163, 168. As Grego repeatedly tried to walk around Shull, he continued to block her path in an increasingly aggressive manner. N.T., at 163-68. Now frightened, Grego pushed Shull, but he remained in front of her. *Id.* She pushed harder, and, according to Grego, he "got really mad and kind of snapped and came at me." N.T., at

- 4 -

163. At that point, Shull grabbed for Grego's purse with one hand and held her body with the other. N.T., at 171.

"When he couldn't separate me from any of my things, he just whipped me down on the ground[,]" Grego testified. N.T., at 169. With Grego on her back, Shull reached down, grabbed her by her hair, and dragged her as he walked in the direction opposite from her destination. *Id.* It was at this point that Grego looked up and saw a gun in Shull's other hand. N.T., at 169-70. Utterly panicked, Grego began to scream as Shull continued to drag her "like luggage" without either looking down at her or saying anything for just under ten seconds, Grego estimated, before a police car turned the corner. N.T.,at 172-73. Grego described her experience and observations as follows:

> **Q:** I mean, were you afraid?
>
> **A:** I was very afraid. I didn't feel very human just because, like I said, when you are on your back, you are completely submissive. The person that is kind of controlling you, I guess, if they're not even looking at you, I just felt kind of dehumanized, I guess. I have never felt that way before.
>
> So, like I said, I looked up at him. Saw just the back of his head as he was pulling me. I saw the gun and that's when I got really afraid. So I just looked straight up. I thought, okay, look for anything that you can get assistance from. I'm looking at the apartment buildings, looking for a parked car, like, just any kind of assistance, No lights were on in the tops of the windows. No lights. No cars. Obviously, no store is open.
>
> So I just felt very alone. There was no one else on the streets. So, yeah, I just felt very helpless and, like I said, I was screaming. But then after I [] belted out a good four of them, I kind of realized there's no one here to help me and screaming

might not work.  I kind of felt like a statistic.  I thought, you know, this happens every day to people and you hear about it in the news but I never thought it was going to happen to me, but I guess this is going to happen.  Whatever is going to happen is going to happen.  So, there's that odd, like, sad, acceptance that --

**Q:**  You realize you were –

**A:**  --I had no control.

*\*\*\**

**Q:**  Can you describe what you saw of the gun/

**A:**  I saw – he was holding it as if you were going to, you know, shoot something, you know, finger in the right place for the trigger.  He was holding the end of it.  I saw the – I don't know anatomy.

**Q:**  That's okay.

**A:**  I saw the barrel, if you will.  So that's what I saw.  I knew immediately what it was.  It looked like a gun a police officer might carry.  So I recognized it very –

**Q:**  Did you[--]

**A:**  -- quickly.

**Q:**  --think it was real?

**A:**  Yes.  That's when, like I said, I looked up and just looked for help because I knew that this is real right now.  It's not someone just, you know, messing with me.  He's – something bad is going to happen right now and I have no idea what it is.

*\*\*\**

**Q:**  So, he had it out – just out in the open holding it in his one hand?

**A:**  Yes, and me in the other.

*\*\*\**

**Q:**  Do you know anything about guns?

**A:** A little. My parents are police officers and my dad and my brother and grandpa hunt. So I have always been around them. I don't use them for anything.

**Q:** Did you have an impression of what kind of gun you thought it was?

**A:** Like I said, it looked exactly like the ones that kind of [sic] police officers carry.

N.T., at 174-75, 176-77, 178-79. On cross-examination, Grego confirmed that Shull was holding the gun as if he was going to shoot someone. N.T., at 185-86.

Officer Adam Salyards of the State College Police Department was passenger in his patrol car at the intersection of West College Avenue and South Burrowes Street at approximately 3:00 a.m. when he and fellow officer, Officer Jeremy Gibson, heard what Salyards described as a "blood-curdling scream" from nearby. N.T., at 86. Sensing something was "very bad…very wrong" from the "worst scream" he had ever heard in his 13 years' service, Officers Salyards and Gibson turned down South Burrowes, where the officers immediately saw Grego near the corner at Calder and a man, Shull, running away. N.T., at 87-88. The officers pursued Shull approximately 200 feet onto New Alley where they saw him getting into the driver's side of a vehicle already occupied by a passenger. N.T., at 89. The officers used their patrol car to block this vehicle and approached the vehicle on foot.

Officer Salyards encountered Sepich in the passenger seat and, seeing what appeared to be a black semi-automatic handgun[2] at Sepich's feet,[3] alerted Officer Gibson of a gun and pulled Sepich out and down to the ground, where he handcuffed him, performed a weapons frisk, and placed him under arrest. N.T., at 91. Officer Gibson did the same with Shull. *Id.* As the officers transported Shull and Sepich to the police station, they received a dispatch stating a female called to report an armed man wearing a black checkered shirt and dark jeans had just attacked her at Calder Street. N.T., at 92. Officer Salyards advised the dispatch center that Officer Gibson and he had just arrested a suspect observed fleeing the scene and matching the physical description perfectly. N.T., at 92-93.[4] A subsequent investigation of Shull's vehicle revealed that the gun in question was, in fact, a CO-2 powered BB gun made to replicate a real firearm. N.T., at 95-96.

_____

[2] Officer Salyards would testify at trial that he is very familiar with firearms as a police officer, is a certified firearms instructor, and grew up with firearms as a member of a family of hunters. He testified that the gun in question looked like a real firearm. N.T., at 91-92.

[3] Sepich testified that Shull threw the gun into the passenger side of the car as he returned. N.T., at 54.

[4] The Commonwealth also introduced surveillance video from an interior camera at the Elliott Building depicting a man in a black checkered hoodie and dark pants jogging toward the Calder Street scene and, minutes later, "running hastily" away with Officers Salyards and Gibson giving chase. N.T., at 153-54.

State College Police Officer Ken Ferron met with Grego outside her apartment a few minutes after she placed her emergency phone call. N.T., at 145-46. He described her physical and emotional appearance as consistent with the report she had given to the dispatcher, as her hair was dirty and messy, her clothing was disheveled, and she was crying at times while relating the attack. N.T., at 147. Grego agreed to provide a "show-up identification," and Officer Ferron transported her to the arrest scene, where Shull and Sepich were seated in the patrol car. Without hesitation, Grego identified Shull as her assailant. N.T., at 150-51, 180. She also identified the car as the one she observed at the parking deck shortly before her ordeal. N.T., at 181. Grego then agreed to go to the State College Police Station to provide a written statement. N.T., at 151.

On November 4, 2014, Shull was charged with one count of first-degree felony Robbery—Fear of Serious Bodily Injury and other offenses listed, *supra*. Shull subsequently filed a December 2, 2014, Petition to Transfer Criminal Proceedings to Juvenile Court. After a hearing, the court entered an order denying Shull's petition, voicing concerns about Shull's failed rehabilitation efforts to-date and reasoning that the robbery, committed by an armed perpetrator, posed a serious threat to both the victim, individually, and the public, as it had a harmful impact on the community's sense of safety. Order, filed 2/13/15, at 2-5.

On April 2, 2015, Shull filed a Motion to Disqualify the Centre County District Attorney, Stacy Parks Miller, based on civil proceedings she had filed

naming defense counsel as one of the defendants. Specifically, the civil matter stemmed from an unrelated case in which defense counsel had unsuccessfully sought recusal of the presiding judge for the appearance of impropriety stemming from an alleged relationship between the judge and the District Attorney. The court denied this motion on April 27, 2015.

On June 17, 2015, the trial court presided as finder of fact in Shull's waiver trial, and, at the conclusion of evidence, it convicted Shull of all charges. Specifically, the court made a finding of fact that Shull possessed a deadly weapon during the commission of his crimes.

During the sentencing hearing of August 11, 2015, the court made a determination that the Deadly Weapon Possession sentencing enhancement applied under the facts proven at trial, but refused to apply the more severe Deadly Weapon Used enhancement sought by the Commonwealth. The court applied the enhancement matrix as its sentencing starting point and, from there, deviated downward to issue a mitigated range sentence of 29 to 59 months' incarceration, to be followed by 5 years' probation on the count of Robbery, with concurrent sentences entered on the remaining charges. Furthermore, the court insisted and ruled, over Commonwealth objection, that Shull was to serve his sentence in a county correctional facility.

The Commonwealth filed a timely Motion to Modify Sentence seeking application of the Deadly Weapon Used sentencing enhancement and a standard range sentence based upon that sentencing matrix. The

Commonwealth also contested county placement for Shull, insisting that he serve a state sentence in a state correctional facility.

The court conducted a hearing on the post-sentence motion on September 2, 2015, and, as detailed more fully, *infra*, withdrew its previous sentence in favor of an even more lenient sentence of incarceration of 11 ½ to 24 months, less one day, in a county correctional facility, provided Shull agree to waive his right to parole and serve the full 24 months, less one day. The court explained that it was reducing Shull's sentence in order to avoid a statutory provision that conditions county placement for a maximum sentence of between two and five years' incarceration on a district attorney's prior consent. In the case *sub judice*, District Attorney Parks Miller did not consent to county placement for a crime she insisted warranted state placement.

On September 16, 2015, the Commonwealth filed timely notice of appeal, while Shull filed his timely notice of appeal on September 25, 2015. This Court, *sua sponte*, consolidated the two appeals.

In its appeal, the Commonwealth presents the following three questions for our review:

1. **WHETHER THE LOWER COURT ABUSED ITS DISCRETION BY REFUSING TO APPLY THE DEADLY WEAPON USED ENHANCEMENT SINCE THE DEFENDANT'S USE OF THE WEAPON WAS UNDISPUTED?**

2. **WHETHER THE LOWER COURT ABUSED ITS DISCRETION BY SENTENCING THE DEFENDANT**

**OUTSIDE THE GUIDELINES WITHOUT SUFFICIENT JUSTIFICATION?**

**3. WHETHER THE LOWER COURT ABUSED ITS DISCRETION WHEN IT IMPROPERLY MODIFIED THE DEFENDANT'S SENTENCE FOR THE SOLE PURPOSE OF CHANGING THE PLACE OF CONFINEMENT?**

Commonwealth's brief at 6.

In its first issue, the Commonwealth argues that the trial court abused its sentencing discretion when it applied the Deadly Weapon Possessed enhancement rather than the Deadly Weapon Used enhancement in setting Shull's sentence.[5] [6] At the sentencing hearing, the trial court determined

_____

[5] The Deadly Weapon enhancement appearing at "§ 303.10. Guideline sentence recommendations: enhancements[,]" provides, in pertinent part:

(a) *Deadly Weapon Enhancement.*

(1) When the court determines that the offender possessed a deadly weapon during the commission of the current conviction offense, the court shall consider the DWE/Possessed Matrix (§ 303.17(a)). An offender has possessed a deadly weapon if any of the following were on the offender's person or within his immediate physical control:

(i) Any firearm, (as defined in 42 Pa.C.S. § 9712) whether loaded or unloaded, or

(ii) Any dangerous weapon (as defined in 18 Pa.C.S. § 913), or

(iii) Any device, implement, or instrumentality designed as a weapon or capable of producing death or serious bodily injury where the court determines that the offender intended to use the weapon to threaten or injure another individual.

*(Footnote Continued Next Page)*

(2) When the court determines that the offender used a deadly weapon during the commission of the current conviction offense, the court shall consider the DWE/Used Matrix (§ 303.17(b)). An offender has used a deadly weapon if any of the following were employed by the offender in a way that threatened or injured another individual:

> (i) Any firearm, (as defined in 42 Pa.C.S. § 9712) whether loaded or unloaded, or
>
> (ii) Any dangerous weapon (as defined in 18 Pa.C.S. § 913), or
>
> (iii) Any device, implement, or instrumentality capable of producing death or serious bodily injury.

204 Pa. Code § 303.10.

[6] The imposition of the deadly weapon sentencing enhancement does not implicate the Supreme Court of the United States' holdings in ***Alleyne v. United States***, –––U.S. ––––, 133 S.Ct. 2151 (2013), or ***Apprendi v. New Jersey***, 530 U.S. 466, 120 S.Ct. 2348 (2000). As this Court explained:

> In both [***Alleyne*** and ***Apprendi*** ], the Supreme Court determined that certain sentencing factors were considered elements of the underlying crime, and thus, to comply with the dictates of the Sixth Amendment, must be submitted to the jury and proven beyond a reasonable doubt instead being determined by the sentencing judge. However, this inquiry is not relevant to our case because of the nature of the DWE.
>
> ***Alleyne*** and ***Apprendi*** dealt with factors that either increased the mandatory minimum sentence or increased the prescribed sentencing range beyond the statutory maximum, respectively. Our case does not involve either situation; instead, we are dealing with a sentencing enhancement. If the enhancement applies, the sentencing court is required to raise the standard guideline range; however, the court retains the discretion to sentence outside the guideline range. Therefore, neither of the situations addressed in ***Alleyne*** and ***Apprendi*** are implicated.

that the CO-2 BB gun he held during the robbery was a deadly weapon for purposes of the Deadly Weapon Possessed enhancement, 204 Pa.Code § 303.10(a)(1), and the court acknowledged it was, thus, bound to consider the DWE/Possessed matrix at § 303.17(a) in fashioning Shull's sentence. The Commonwealth, however, filed a post-sentence motion asserting that evidence establishing Shull's open display of the gun while attacking Grego supported application of the more severe Deadly Weapon Used enhancement at § 303.10(a)(2) and, therefore, mandated consideration of the DWE/Used matrix at § 303.17(b).

At the hearing on the Commonwealth's motion, the court noted that the Commonwealth had limited its charges against Shull to possession, rather than use, of a firearm during the commission of a crime. N.T., 9/2/15 at 5-6. Moreover, it was the court's view that Grego's testimony did not prove, beyond a reasonable doubt, "that the defendant 'used' the weapon in a manner that would require the imposition of . . . an enhanced sentence." N.T., at 5. Accordingly, as noted above, it used the Deadly Weapon Possessed enhancement matrix as the starting point for imposing Shull's sentence.

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

**Commonwealth v. Buterbaugh**, 91 A.3d 1247, 1270 n. 10 (Pa.Super. 2014), **appeal denied**, 104 A.3d 1 (Pa. 2014).

Though the Commonwealth concedes that the trial court applied a deadly weapons enhancement, its Pa.R.A.P. 2119(f) statement asserting that the court failed to apply the correct enhancement raises a substantial question regarding the exercise of sentencing discretion. These claims challenge the discretionary aspects of sentencing. *See Commonwealth v. Kneller,* 999 A.2d 608, 613 (Pa.Super. 2010) (*en banc*) ("a challenge to the application of the deadly weapon enhancement implicates the discretionary aspects of sentencing."). Moreover:

> [t]o be reviewed on the merits, a challenge to the discretionary aspects of sentence must raise a substantial question that the sentence imposed is not appropriate. [*Commonwealth v.* ]*Pennington*, [751 A.2d 212, 215 (Pa.Super. 2000)] (citing 42 Pa.C.S.A. § 9781(b)). A substantial question is raised when the appellant advances a "colorable argument" that the sentence was either "inconsistent with a specific provision of the Sentencing Code" or "contrary to the fundamental norms which underlie the sentencing process." *Id.* at 215–16.

> Our case law has established that application of the deadly weapons enhancement presents a substantial question. *See id.* at 216 (concluding that the appellant raised a substantial question by challenging the trial court's application of the deadly weapons enhancement, based on the appellant's assertion that he had not had actual possession of the deadly weapon, a gun); *Commonwealth v. Hatcher*, 746 A.2d 1142, 1144 (Pa.Super. 2000) (same); *Commonwealth v. Magnum*, 439 Pa.Super.616, 654 A.2d 1146, 1149–50 (1995) (concluding that the Commonwealth raised a substantial question by challenging the trial court's failure to consider a deadly weapons enhancement in a situation where the appellant used a knife to threaten the victims); [*Commonwealth v.*] *Scullin*, [607 A.2d 750, 752–53 (Pa.Super. 1992)] (concluding that the Commonwealth raised a substantial question by challenging the trial court's determination that a tire iron thrown by the appellee was not a deadly weapon).

- 15 -

*Commonwealth v. Raybuck*, 915 A.2d 125, 127–28 (Pa.Super. 2006).

*See also Commonwealth v. Diamond*, 945 A.2d 252, 259 (Pa.Super. 2008) (recognizing "this Court has repeatedly instructed that the sentencing court must correctly apply the sentencing guidelines to reach the correct point of departure, before exercising its discretion to depart from the guidelines in any particular case. These rules apply to the deadly weapons enhancement.")

When reviewing a challenge to the discretionary aspects of sentencing, we observe the following standard:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Antidormi*, 84 A.3d 736, 760 (Pa.Super. 2014), *appeal denied*, 95 A.3d 275 (Pa. 2014).

In its brief, the Commonwealth reiterates the position it took in its post-sentence motion that Shull "used" the realistic gun replica, thus triggering the deadly weapon enhancement, when he held it in Grego's plain view during his attempted robbery. In support of its position, the Commonwealth points to Grego's testimony that she felt an utter sense of hopelessness upon seeing Shull's finger on the trigger as he dragged her away from her intended destination.

Shull responds that the evidence fails to support that he used the gun in furtherance of the commission of his crime. According to Grego, Shull never pointed the gun at her, referred to it in any way, or even looked at Grego while he held the gun in his hand. Though the gun was, therefore, visible during the crime, Shull maintains, it was not used as part of the crime. We disagree.

As noted above, Section 303.10(a)(2) provides, in pertinent part, that an offender has used a deadly weapon if he or she employed a firearm, loaded or unloaded, in a way that threatened another individual. Viewed under this statutory definition, Shull's mere possession of a gun transcended to his use of the gun as an implement of submission and fear when he decided to remove it from under his clothing and hold it—with finger on trigger—directly above Grego's face as she lay helplessly under his forcible control. Indeed, Shull's presentation of the gun in this manner had a terrifying effect on Grego, who testified her concern amplified when she first saw the gun in her assailant's hand, as she realized at that point this was not someone just "messing with me" and believed something "bad is going to happen right now."

Under these circumstances, the fact that Shull never actually stopped and pointed the gun at Grego in the several seconds before he heard police sirens and fled is of no moment to the inquiry before us, as he had already made the gun a component part of his use of force when he revealed it to his victim as he brutally dragged her to some intended location. **See**, **e.g.**,

***Commonwealth v. Chapman***, 528 A.2d 990 (Pa.Super. 1987) (deadly weapon used enhancement applied where defendant openly held a straight razor during robbery, though never made explicit threat with it).

Accordingly, because the record established that Shull used the gun in a threatening way during his attack of Grego, we conclude the trial court's rejection of the Deadly Weapon Used enhancement was manifestly unreasonable. We, therefore, vacate sentence and remand for resentencing, where the court shall acknowledge and apply the proper guideline range before exercising its sentencing discretion.

In its remaining two issues, the Commonwealth asserts that the court unreasonably departed from both the enhancement and the robbery guideline ranges when it imposed a below-mitigating range departure sentence designed for the sole purpose of securing a county sentence for Shull. For Shull's conviction of Robbery—Fear of Serious Bodily Injury, the sentencing guidelines' standard range sentence was 22 to 36 months without application of any weapons enhancement, 31 to 45 months with a DWE/Possessed application, and 40 to 54 months with an DWE/Used application. At the initial sentencing hearing, the court applied a DWE/Possessed enhancement and, in its discretion, imposed a mitigated range 29 to 59 month sentence with the intention of placing Shull in a county correctional facility.

At the post-sentence motion hearing, however, the court observed that, under 42 Pa.C.S. § 9762(b)(2),[7] it was unable to place Shull in the county facility unless the District Attorney consented, and she did not consent. For this reason, alone, the court *sua sponte* reduced Shull's

_____

[7] Section 9762(b)(2), "Sentencing proceeding; place of confinement," provides, in pertinent part:

**(b) Sentences or terms of incarceration imposed after a certain date.--**All persons sentenced three or more years after the effective date of this subsection to total or partial confinement shall be committed as follows:

\*\*\*

(2) Maximum terms of two years or more but less than five years shall be committed to the Department of Corrections for confinement, except upon a finding of all of the following:

(i) The chief administrator of the county prison, or the administrator's designee, has certified that the county prison is available for the commitment of persons sentenced to maximum terms of two or more years but less than five years.

(ii) The attorney for the Commonwealth has consented to the confinement of the person in the county prison.

(iii) The sentencing court has approved the confinement of the person in the county prison within the jurisdiction of the court.

(3) Maximum terms of less than two years shall be committed to a county prison within the jurisdiction of the court.

42 Pa.C.S. § 9762(b)(2) and (3).
    i

sentence to 11 ½ to 24 months, less one day, to circumvent the restrictions

of Section 9762(b)(2):

> **THE COURT:** It was my desire that this defendant be sentenced locally. Maybe he's changed his mind now, and [defense counsel] can interrupt me and say, fine, we'll go to the State, and we can all go home, but it's my intention this defendant serve a sentence in a County correctional facility.
>
> First, he is relatively young. He was only 17 when this offense took place. Secondly, if you put him in a facility such as a State Correctional Institution, it just seems to me that he's going to be destroyed by the people that are there, particularly because of his ethnic background.
>
> And I say that in two ways. No. 1 is that perhaps he's going to be picked on because of his ethnic background. Secondly, because he does have a particular ethnic background they may ver well put him into some kind of a gang or something in the State Correctional Institution that might not as readily occur in a County facility. So I want him in a County facility.
>
> Finally, there was testimony throughout these proceedings about the treatment locally, either provided by the county or financed by his parents, that could be provided here in Centre County.
>
> All they do is warehouse people in State Correctional Institutions. They don't provide any kind of treatment, and they don't do anything for people except hold them as long as they possibly can and then subject them to the whims of the parole board as to when they should be released.
>
> So for a number of reasons I think he should serve his sentence here. His parents obviously can see him more readily if he's here and maintain the family relationships that are manifested in all of the letters that were written in his support at the time of his sentencing.
>
> It just seems to me that logically the place of incarceration should be the county, and although I agree to some extent with the Commonwealth's position that I'm not totally positive that this young man is going to straighten himself out, I don't see

him as being the type of threat to the public at this point that requires him being locked up in a State correctional facility. So that's why I want him sentenced locally.

In order to do that, the way I had to do that was to fashion the 29-month to 59-month sentence that I did, and of course immediately at the conclusion [the prosecutor] said you can't do that.

I said, well, I just did it, but as I'm walking back, I'm thinking to myself there is something here I'm kind of forgetting. [Court goes on to discuss the need to obtain the District Attorney's consent to county placement.] So I agree that unless the Commonwealth approves a County sentence a 29 to 59-month sentence has to be served in State.

Now having said that, I want this defendant to serve a County sentence. So you know how I can resolve the problem. I can sentence even more mitigated than you think I did, and I can give him an 11 1/2 to 24 month less one day sentence in the County, and if I do that, I want – if I'm going to do that, I would ask the defense attorney to consult with his client and see whether his client would agree to that kind of a sentence on the condition that he never be paroled, so that he served 24 months less one day instead of the 29 months that I've already given him, five months less protection from the public than the district attorney's office wants him to be, [sic] and that's what I'm inclined to do unless you agree that he can serve his sentence in the County.

That's my position; do you want to respond?

**PROSECUTOR:** Yes, sir. Well, first of all, Your Honor, I think case law actually provides you can't fashion a sentence based on the results you want.

When it comes to the deadly weapon enhancement, if you believe it's appropriate, and you already ruled that you believed the deadly weapon enhancement was appropriate, you state there.

**THE COURT:** For possessed. I'm sentencing below the mitigated range, and I'm giving my reasons, and if the appellate

court thinks the reasons aren't appropriate, then they'll remand for resentencing.

But I can't do it because you're preventing me from imposing the sentence that I think is most appropriate for this defendant and the public and the judicial system.

You're preventing me from doing that by refusing to consent to a sentence in the County, and you have the right to do that, and you didn't have it six days before my sentence date, but you do now, and I agree.

**PROSECUTOR:** Your Honor, we don't consent. I don't believe that it's our obligation to consent. The fact of the matter is the legislature said this sentence should be served unless we consent. There may be special extenuating circumstances in other cases, but we don't believe it's appropriate here for the reasons we've outlined in our motion.

I think his sentence needed to be within the standard range, within even the possessed range. I don't think you can get a – fashion a sentence to get a particular result. You base it off the guidelines and the considerations that are allowed by law.

***

**THE COURT:** I don't have to sentence in a standard range or a mitigated range or an aggravated range. All I have to do is explain my reasons. . . . My reasons are to try to get this boy out of the public as long as possible consistent with a County sentence. You won't let me do that.

**PROSECUTOR:** Your Honor, for the reasons that we've already outlined, we think the sentence needed to be standard range and not based on his place of confinement.

His place of confinement is statutory. It's not up to the DA's office to consent to a particular result.

***

The fact of the matter is it can't be held over the DA's head as to choose this, ['] if you don't consent I'm going to give him an even more mitigated sentence.['] That's not a mitigating factor, the fact the DA wouldn't consent to what is statutory.

- 22 -

> **THE COURT:** There is nothing statutory, ma'am. The statute says you can agree to have him serve his sentence in the County. That's a discretionary thing for the district attorney.
>
> I give him 29 months in the County if you agree to it. If you don't agree to it, I'm forced to give him 11 ½ to 24 months less a day.

N.T., 9/2/15, at 10-15.

We assess whether the trial court's guideline departure sentence represents an abuse of discretion in light of Section 9781 of the Sentencing Code, which sets forth an appellate court's statutory obligations in reviewing a sentence. Specifically, Subsection (c) provides:

> **(c) Determination on appeal.**—The appellate court shall vacate the sentence and remand the case to the sentencing court with instructions if it finds:
>
> (1) the sentencing court purported to sentence within the sentencing guidelines, but applied the guidelines erroneously;
>
> (2) the sentencing court sentenced within the sentencing guidelines but the case involves circumstances where the application of the guidelines would be clearly unreasonable or
>
> (3) *the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable.*
>
> In all other cases the appellate court shall affirm the sentence imposed by the sentencing court.

42 Pa.C.S.A. § 9781(c) (emphasis added). Thus, we must specifically review a guideline departure sentence for reasonableness. *See **Commonwealth v. Perry**,* 32 A.3d 232, 236–37 (Pa. 2011). Subsection (d) sets forth the factors to be considered in determining whether a departure sentence is unreasonable:

- 23 -

**(d) Review of record.**—In reviewing the record the appellate court shall have regard for:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant.

(2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.

(3) The findings upon which the sentence was based.

(4) The guidelines promulgated by the commission.

42 Pa.C.S.A. § 9781(d). **See Perry**, **supra**. In turn, the sentencing court shall impose its sentence in consideration of Section 9721(b) of the Code, which provides:

[T]he sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant.

42 Pa.C.S.A. § 9721(b).

Our own jurisprudence has expounded on the above authority:

In every case where a sentencing court imposes a sentence outside of the sentencing guidelines, the court must provide in open court a contemporaneous statement of reasons in support of its sentence. 42 Pa.C.S.A. § 9721; **see also Commonwealth v. Eby**, 784 A.2d 204, 205–206 (Pa.Super. 2001).

The statute requires a trial judge who intends to sentence a defendant outside of the guidelines to demonstrate on the record, as a proper starting point, [its] awareness of the sentencing guidelines. Having done so, the sentencing court may deviate from the guidelines, if necessary, to fashion a sentence which takes into account the protection of the public, the rehabilitative needs of the defendant, and the gravity of the particular offense as it relates

- 24 -

> to the impact on the life of the victim and the
> community, so long as [it] also states of record the
> factual basis and specific reasons which compelled
> [it] to deviate from the guideline range.

***Commonwealth v. Gibson***, 716 A.2d 1275, 1276–1277 (Pa.Super. 1998) (internal quotations omitted).

> When evaluating a challenge to the discretionary aspects of
> sentence . . . it is important to remember that the sentencing
> guidelines are advisory in nature. ***Id.*** at 1277. If the
> sentencing court deems it appropriate to sentence outside of the
> guidelines, it may do so as long as it offers reasons for this
> determination. ***Id.*** "[O]ur Supreme Court has indicated that if
> the sentencing court proffers reasons indicating that its decision
> to depart from the guidelines is *not un* reasonable, we must
> affirm a sentence that falls outside those guidelines." ***Id.***
> (citations omitted, emphasis in original).

***Comnmonwealth v. Bowen***, 55 A.3d 1254, 1263–64 (Pa.Super. 2012).

***See also Commonwealth v. Rodda***, 723 A.2d 212 at 216 (Pa.Super. 1999) (holding record must demonstrate "with clarity that the court considered the sentencing guidelines in a rational and systematic way and made a dispassionate decision to depart from them); ***Commonwealth v. Gause***, 659 A.2d 1014, 1017 (Pa.Super. 1995) (noting it is not enough for court to pay "token lip service" to sentencing guidelines simply as prerequisite to impose whatever sentence it may choose; departure sentence reasonable where particular facts differentiate case from typical case of same offense).

A sentencing court, therefore, in carrying out its duty to impose an individualized sentence, may depart from the guidelines when it properly identifies a particular "factual basis and specific reasons which compelled [it]

to deviate from the guideline range." **Gibson**, **supra**. In the case *sub judice*, however, the court supplied an inexplicably inadequate factual basis to substantiate a sentence significantly below the mitigating range for a typical first-degree felony robbery conviction, let alone one for which a deadly weapon enhancement also pertained.

In fact, the notes of testimony reproduced, *supra*, clarify that the court tailored a sentence according not to the individual history and circumstances surrounding Shull and the crime he committed but, instead, to what was necessary to avoid a State sentence for Shull, regardless of whether the term was consistent with the principles promoted within the scheme. For example, other than citing Shull's age and making unconfirmed, general propositions about the fate of SCI inmates of Shull's ethnicity, the court engaged in no discussion as to why Shull's particular circumstances warranted a severe downward departure sentence. Neither Shull's personal history nor his amenability to rehabilitation were cited as militating in favor of departing downward from the guideline ranges. To the contrary, in its previous sentencing hearing reference to the prospects of rehabilitation, the court voiced serious doubts concerning Shull's future, indicating that he found himself in this position despite his parents' considerable expenditure of time and money in previous failed efforts to help their son right himself. N.T. 8/11/15 at 40.

The trial court had the opportunity to observe Shull in person, listened to Shull's allocution statement expressing remorse, and was fully cognizant

of all relevant factors and circumstances regarding Shull's situation. It is also clear from the sentencing hearing of August 11, 2015, that the court considered Shull's attack of Grego to be a terrifying one that reasonably placed her in fear of sustaining serious injury or worse. N.T. at 18-19, 40. Nevertheless, despite its global familiarity with Shull's case, the court failed to give an appropriate justification, rooted in the considerations and factors espoused in statutory and decisional law, for the severe downward departure sentence it imposed.

The court's skepticism concerning the state correctional system's ability to rehabilitate Shull as well as can the county system, a subjective notion unsupported by any facts of record, provides insufficient grounds for this sentence. **See Commonwealth v. Wilson**, 946 A.2d 767 (Pa.Super. 2008) ("second guessing" of SCI's ability to administer adequate drug treatment supplied no justification for less-than-mitigated-range county sentence of 11 ½ to 23 month sentence for two first-degree felony burglaries, robberies, and possession of instrument of crime; elevating defendant's needs without giving due weight to guidelines, victim, or societal needs rendered sentence unreasonable under Section 9781(d)); **See also Commonwealth v. McIntosh**, 911 A.2d 513 (Pa.Super. 2006) (deeming sentence unduly lenient where sentencing court was "oddly deferential" to defendant and concern for defendant's rehabilitative needs outweighed court's consideration of section 9718 factors), **aff'd in part and rev'd in part on other grounds**, 922 A.2d 873 (Pa. 2007).

The court's singular purpose of circumventing a statutory scheme requiring state confinement for the sentence the court would have otherwise imposed produced an inappropriate sentence that failed to reflect due consideration of the deadly weapon enhancement guideline ranges, Shull's lack of amenability to prior rehabilitation efforts, the disturbing circumstances of his crime and its effect on the victim, and the public safety needs of society at large. Under the facts of the present case, therefore, we deem the departure sentence entered in the court below unreasonable in light of considerations set forth in Section 9781(d) of the Sentencing Code.[8] Accordingly, we vacate sentence and remand this matter for resentencing in a manner consistent with sentencing principles discussed above.

Turning to Shull's cross-appeal, we note he presents the following questions for our review:

> I. **WHETHER THE HONORABLE TRIAL COURT ERRED BY DENYING APPELLEE'S MOTION TO DISQUALIFY THE DISTRICT ATTORNEY DESPITE A CONFLICT OF INTEREST AND APPEARANCE OF IMPROPRIETY THAT EXISTED DUE TO TWO LAWSUITS FILED BY THE DISTRICT ATTORNEY AGAINST APPELLEE'S TRIAL ATTORNEY?**
>
> II. **WHETHER THE HONORABLE TRIAL COURT ERRED BY DENYING TO TRANSFER [SIC] THE INSTANT MATTER TO JUVENILE COURT FOR MULTIPLE REASONS, INCLUDING, BUT NOT LIMITED TO THE FOLLOWING:**

---

[8] This Court is astonished at the efforts the trial court made to keep Shull out of a state correctional institute.

a. THE CASE WAS NOT PROPERLY FILED IN ADULT COURT UNDER 42 Pa.C.S.A. § 6322 BECAUSE THE CONDUCT DID NOT MEET THE DEFINITION OF DELINQUENT ACT SINCE [CROSS-APPELLANT] DID NOT USE A DEADLY WEAPON DURING THE COMMISSION OF A ROBBERY (AS EVIDENCED BY THE TRIAL COURT'S DETERMINATION AT SENTENCING NOT TO APPLY THE DEADLY WEAPON USED ENHANCEMENT);

b. [CROSS-APPELLANT] ESTABLISHED BY A PREPONDERANCE OF THE EVIDENCE THAT HIS TRANSFER TO JUVENILE COURT WOULD SERVE THE PUBLIC INTEREST PURSUANT TO 42 Pa.C.S.A. § 6322.

III. WHETHER THE HONORABLE TRIAL COURT ERRED BY FINDING THE [CROSS-APPELLANT] GUILTY OF ROBBERY WHEN THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT ALL REQUISITE ELEMENTS OF ROBBERY AS DEFINED IN 18 Pa.C.S.A. § 3701(A)(1)(ii), SPECIFICALLY THAT [CROSS-APPELLANT] THREATENED THE VICTIM OR INTENTIONALLY PUT THE VICTIM IN FEAR OF IMMEDIATE SERIOUS BODILY INJURY?

IV. WHETHER THE HONORABLE TRIAL COURT ERRED BY ADMITTING PRIOR INSTANCES OF CONDUCT OF [CROSS-APPELLANT] ALLEGEDLY COMMITTING THEFT WHEN THE PRIOR INCIDENTS WERE UNCHARGED CONDUCT, INADMISSIBLE PROPENSITY EVIDENCE PURSUANT TO PENNSYLVANIA RULES OF EVIDENCE 404(B) THAT THE HONORABLE TRIAL JUDGE HIMSELF STATED ON THE RECORD THAT THE EVIDENCE WAS IRRELEVANT?

V. WHETHER THE HONORABLE TRIAL COURT ERRED BY NOT PROVIDING CREDIT FOR TIME SERVED FOR [CROSS-APPELLANT'S] PRE-TRIAL INPATIENT TREATMENT DUE TO THE FACT THAT THE INPATIENT TREATMENT WAS COURT ORDERED?

Cross-Appellant's brief at 6.

In his first issue, Shull charges error with the trial court's ruling denying his motion to disqualify District Attorney Parks Miller despite an alleged conflict of interest and appearance of impropriety because of two unrelated civil suits she filed naming defense counsel as one of many defendants.[9] At the April 10, 2015, hearing on the motion, defense counsel requested that the Office of the Attorney General handle the matter at bar, a request the prosecutor opposed and the court, ultimately, denied.

According to defense counsel, the prosecutor's "status as plaintiff in a civil action against him, standing alone, constitutes an actual conflict of interest." Cross-Appellant's brief at 30. Moreover, Shull's mother, an attorney, represents one of the named defendants in the civil suit filed by the prosecutor, defense counsel maintains. Although the suit post-dated Shull's conviction in the present case, defense counsel maintains, it pre-

---

[9] Shull alleges that District Attorney Parks Miller filed her civil law suit, asking for declaratory relief, in retaliation for defense counsel's filing a Right to Know Law request seeking discovery of records of electronic communications between the District Attorney and the Honorable Judge Bradly Lunsford of the Court of Common Pleas of Centre County. The suit was filed prior to Shull's conviction and sentence. Defense counsel was ultimately dismissed from the matter, but prior to argument on Shull's post-sentence motions, District Attorney Parks Miller filed a second complaint alleging, *inter alia*, defamation against defense counsel and eleven other defendants. This second matter was removed to federal court.

dated argument on post-sentence motions on September 2, 2015. Cross-Appellant's brief at 32.[10]

From Shull's perspective, the Commonwealth exhibited its conflict of interest throughout trial and during post-sentence motions. For instance, although prosecutor Nathan Boob indicated at a February 17, 2015 status hearing that the Commonwealth intended to discuss a plea offer with Shull's family, N.T., 2/17/15 at 4-5, the District Attorney never made such an offer. Before the commencement of Shull's non-jury trial, defense counsel apprised the court that this was the first time in his 17-year career that he had not received a plea offer for a non-homicide case. N.T., 6/17/15, at 11. The District Attorney replied that the decision to withhold a plea offer was entirely evidence-based, as this was the type of "very serious case" in which her office typically does not offer plea agreements. N.T., at 17-18. The prosecutor also advised the court that the defense had not indicated a willingness to plead guilty to anything. N.T., at 18.

Defense counsel also alludes to the District Attorney's refusal to provide consent necessary for the trial court to act on its wish to place Shull in a county correctional facility to serve his 29 to 54 month sentence as an

---

[10] We question the relevancy of this aspect of defense counsel's argument, as the appellate challenge before us goes to the trial court's April, 2015, exercise of discretion in denying Shull's motion to remove the prosecutor. It is not explained how proceedings occurring months afterward could bear on the court's earlier exercise of discretion.

additional indication of the prosecutor's inability to serve the public interest. Notably, however, the record reveals no attempt on defense counsel's part to renew his earlier motion to disqualify the prosecutor for taking these positions later in the course of proceedings.

In denying the existence of merit to Cross-Appellant's claim, the Commonwealth responds that jurisprudence of this Commonwealth has consistently held that "conflicting out" a prosecutor requires a showing of conflict between the prosecutor and the defendant. *Compare Commonwealth v. Eskridge*, 604 A.2d 700, 702 (Pa. 1992) (where district attorney's law firm represented car accident victims in personal injury suit against defendant, actual conflict barring prosecution existed; defendant need not prove actual prejudice in order to require that the conflict be removed) *with Commonwealth v. Mulholland*, 549 Pa. 634, 702 A.2d 1027, 1037 (1997) (holding mere allegations of a conflict of interest, however, are insufficient to require replacement of a district attorney). This Court has also found that a new trial is warranted where the district attorney has a non-economic, personal interest in the matter. *See Commonwealth v. Balenger*, 704 A.2d 1385, 1386 (Pa.Super. 1997) (granting a new trial where the prosecutor was involved in a romantic relationship with the defendant's wife), *appeal denied* 727 A.2d 126 (Pa. 1998). Again, the Commonwealth maintains that the District Attorney has no personal interest in the outcome of Shull's matter, nor does the alleged conflict implicate Shull personally.

Instead, the Commonwealth contends that the evidence of the case and the implications surrounding its outcome, alone, justified the prosecutorial posture taken below. Regarding the District Attorney's decisions to withhold both a plea offer and consent to a county sentence, the Commonwealth points to the severity of the crime—including its position that Shull used a deadly weapon to threaten his victim—and the undeniable concern it caused in the community as legitimate grounds for both decisions.

After careful review of the record, the parties' respective positions, and governing decisional law as expressed in *Eskridge* and related cases, *supra*, we conclude that the record before us does not demonstrate a conflict suggesting a prosecutorial inability to serve as a steward of justice and of the court in the proceedings below. In this regard, we find the record amply supports the prosecutor's position that the facts of the case supported the decisions made by the District Attorney's office.

Indeed, Shull points to no decisional law, and we are aware of none, in which a court has construed a prosecutor's failure to offer a plea deal, in and of itself, as an indication of improper prosecutorial motivation. *See Commonwealth v. Smith*, 664 A.2d 622, 627 (Pa.Super. 1995) (holding "Commonwealth is not generally obligated to plea bargain with a defendant but may not refuse to bargain based on any invidious classification such as race, religion or national origin."). Moreover, the District Attorney's authority to withhold consent to county placement in this matter was implied by the very language of Section 9762(b)(2)(ii), which prohibits county

placement without a District Attorney's prior consent. Implicit in this statutory condition is the understanding that the particular circumstances supporting a maximum prison sentence of between two and five years will often times make state placement the appropriate choice. Under this statutory regime, therefore, the refusal to provide consent is clearly within the discretion of the prosecutor, particularly in a case where the defendant's violent crime terrorized the victim. Accordingly, discerning no abuse of discretion with the trial court's order denying Shull's motion to disqualify the District Attorney, we decline to disturb the ruling below. *See Commonwealth v. Stafford*, 749 A.2d 489, 494 (Pa.Super. 2000) (holding absent an abuse of discretion, appellate court constrained to accept the trial court's finding that there was no conflict of interest in prosecutor).[11][12]

In his next issue, Shull argues that the court erred in denying his motion to transfer this matter to juvenile court because the Commonwealth failed to establish that he used a deadly weapon during the commission of a

---

[11] Notably, moreover, the two events Shull emphasizes most in making his appellate argument asserting trial court error—the withholding of a plea offer and of consent to county placement—occurred *after* the court had already denied his motion to disqualify the prosecutor. We decline to find trial court error with a ruling which preceded events that Cross-Appellant asserts as grounds for reversal.

[12] As the certified record enabled meaningful review of Cross-Appellant's first issue, we deny Cross-Appellant's motion to amend the reproduced record to include a copy of the District Attorney's civil complaint filed against defense counsel.

robbery, an act deemed so heinous by the General Assembly as to preclude designation as a "delinquent act" suitable for the juvenile system. He also claims that he established by a preponderance of the evidence that his transfer to juvenile court would serve the public interest pursuant to 42 Pa.C.S. § 6322.

"Decisions of whether to grant decertification will not be overturned absent a gross abuse of discretion. An abuse of discretion is not merely an error of judgment but involves the misapplication or overriding of the law or the exercise of a manifestly unreasonable judgment passed upon partiality, prejudice or ill will." **Commonwealth v. Sanders**, 814 A.2d 1248, 1250 (Pa.Super. 2003). We will review Shull's allegation of error with this standard in mind.

The Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq.,* is designed to effectuate the protection of the public while providing children who commit delinquent acts with supervision, rehabilitation, and care while promoting responsibility and the ability to become a productive member of the community. 42 Pa.C.S.A. § 6301(b)(2). The Act defines a "child" as one who is under eighteen years of age. 42 Pa.C.S.A. § 6302. Shull was seventeen-years-old at the time he committed his robbery of Grego. A delinquent act is, *inter alia,* "an act designated as a crime under the law of this Commonwealth." *Id.*

However, because the General Assembly has deemed some crimes so heinous, a delinquent act does not include:

(i) The crime of murder.

(ii) Any of the following prohibited conduct where the child was 15 years of age or older at the time of the alleged conduct and a deadly weapon as defined in 18 Pa.C.S. § 2301 (relating to definitions) was used during the commission of the offense, which, if committed by an adult, would be classified as:

* * *

(D) Robbery as defined in 18 Pa.C.S. § 3701(a)(1)(i), (ii) or

(iii) (relating to robbery).

*Id.* A deadly weapon is defined by Section 2301 as

> [a]ny firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or serious bodily injury, or any other device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury.

18 Pa.C.S.A. § 2301. Therefore, though Shull was seventeen at the time in question, if he committed the offense of robbery while possessing a deadly weapon, his crime would be considered ineligible for classification as a delinquent act and, accordingly, require that his charges be filed with the criminal court where original exclusive jurisdiction lies and is presumptively proper. *See Commonwealth v. Ramos*, 920 A.2d 1253, 1257–58 (Pa.Super. 2007).

For support, Shull points to our decision in ***Ramos*** as placing the burden on the Commonwealth to present expert testimony that a replica gun was capable of producing death or serious bodily injury. Cross-Appellant's

brief at 36.  Shull misconstrues ***Ramos***, however, as the decision clearly confirmed that the burden of proof in a decertification hearing rests with the juvenile.  Specifically, we made the following observations pertinent to the case *sub judice*:

> To begin, we note that there was some discussion as to who bears the burden of proof relative to whether or not Appellant possessed a deadly weapon.  The trial court stated its inclination that the burden was on the Commonwealth, and the Commonwealth accepted.  The Commonwealth's acquiescence does not make this true, however, and we do not agree.
>
> It is well established that a juvenile seeking decertification has the burden of proving by the preponderance of the evidence that the transfer to juvenile court is warranted.  42 Pa.C.S.A. § 6322; ***Commonwealth v. Cotto***, 562 Pa. 32, 753 A.2d 217 (2000) (the Juvenile Act provides a mechanism for a minor to prove to the court that he does not belong in criminal court via § 6322).  "The propriety of whether charges should be prosecuted in the juvenile court or adult court system implicates jurisdictional concerns."  ***Hughes***, ***supra***, 865 A.2d at 776.  Nonetheless, when the crime involved is one excluded from the Juvenile Act's definition of a delinquent crime, the charge is automatically within the jurisdiction of the criminal court and jurisdiction is presumptively proper.  ***Id.*** at 777, *citing* ***Commonwealth v. Kocher***, 529 Pa. 303, 602 A.2d 1308, 1310 (1992) and ***Commonwealth v. Pyle***, 462 Pa. 613, 342 A.2d 101, 106–107 (1975), ***superseded by statute***.  A challenge to the criminal court's jurisdiction falls on the juvenile.  "To hold otherwise would create the anomalous situation whereby the party in whose favor a legislative presumption has been created is called upon to offer the evidence to support the presumption.  Such a concept would be at variance with the well established principle of the law of evidence that a presumption shifts not only the burden of proof, but also shifts the burden of coming forward with the evidence to establish the fact in issue."  ***Commonwealth v. Greiner***, 479 Pa. 364, 388 A.2d 698, 701– 702 (1978) (holding that the burden of proof rests on the Commonwealth when it seeks to transfer an accused from juvenile court to criminal court).  "The legislative determination

to exclude [specified offenses] from the jurisdiction of the juvenile courts evidenced an assumption that the criminal justice system was the proper forum for the resolution of such matters unless the party seeking the juvenile court as a forum could establish reasons to the contrary." *Id.* Accordingly, Appellant bore the burden of proving that the gun was not a deadly weapon.

*Ramos*, 920 A.2d at 1258–59.

*Ramos* clearly indicates that just as a juvenile bears the overarching burden of proving a transfer to juvenile court is warranted, he or she also bears the burden of coming forward with evidence that a gun in his or her possession was not a deadly weapon for purposes of Section 2301. There is, therefore, no merit to Shull's argument placing this burden upon the Commonwealth.

The second part to Shull's decertification argument states that he established his transfer would better serve the public interest. Specifically, he points to the testimony of two psychiatrists who opined that he suffers from bi-polar disorder and exhibits a level of functioning and maturity comparable to a 14 year-old. The experts also testified Shull possesses a benevolent disposition, lacks a history of aggression or delinquent behavior, and displays no indicia of antisocial or psychotic traits, all of which suggested he was amenable to treatment and counseling which could "alleviate his diminished impulse control and aid his maturity and coping skills[ ]" during his minority. Cross-Appellant's brief at 40.

Shull fails, however, to discuss how the many decertification factors and considerations enumerated in 42 Pa.C.S. § 6355(a)(4)(iii)[13] bore on his

_____

[13] Section 6355(a) provides, in pertinent part:

**(a) General rule.--**After a petition has been filed alleging delinquency based on conduct which is designated a crime or public offense under the laws, including local ordinances, of this Commonwealth, the court before hearing the petition on its merits may rule that this chapter is not applicable and that the offense should be prosecuted, and transfer the offense, where appropriate, to the division or a judge of the court assigned to conduct criminal proceedings, for prosecution of the offense if all of the following exist:

(1) The child was 14 or more years of age at the time of the alleged conduct.
(2) A hearing on whether the transfer should be made is held in conformity with this chapter.
(3) Notice in writing of the time, place, and purpose of the hearing is given to the child and his parents, guardian, or other custodian at least three days before the hearing.
(4) The court finds:
(i) that there is a prima facie case that the child committed the delinquent act alleged;
(ii) that the delinquent act would be considered a felony if committed by an adult;
(iii) that there are reasonable grounds to believe that the public interest is served by the transfer of the case for criminal prosecution. In determining whether the public interest can be served, the court shall consider the following factors:
(A) the impact of the offense on the victim or victims;
(B) the impact of the offense on the community;
(C) the threat to the safety of the public or any individual posed by the child;
(D) the nature and circumstances of the offense allegedly committed by the child;
(E) the degree of the child's culpability;

*(Footnote Continued Next Page)*

case. Simply citing some factors which, standing alone, could support decertification does not establish the gross abuse of discretion required to reverse a court's order refusing to decertify a case. *Cf Commonwealth v. Potts*, 673 A.2d 956, 958 (Pa.Super. 1996) (given limited scope of review of certification decisions, court "'will not set aside a certification unless an appellant demonstrates that the court committed a gross abuse of discretion.'" A gross abuse of discretion is not demonstrated by merely reciting facts of record that would support a result contrary to the court's actual decision.") (citation omitted).

*(Footnote Continued)* ─────────────

> (F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and
> (G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:
> (I) age;
> (II) mental capacity;
> (III) maturity;
> (IV) the degree of criminal sophistication exhibited by the child;
> (V) previous records, if any;
> (VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;
> (VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;
> (VIII) probation or institutional reports, if any;
> (IX) any other relevant factors; and
> (iv) that there are reasonable grounds to believe that the child is not committable to an institution for the mentally retarded or mentally ill.

42 Pa.C.S.A. § 6355(a)(1)-(4).

Here, the trial court considered, for example, that the experts' prognoses for rehabilitation were qualified because Shull was already 18 years old at the time of the hearing and there existed insufficient time to achieve full rehabilitation before he reached 21. "You have got Dr. Altman saying it's [age] 25[,]" the court observed, a point which defense counsel conceded before noting Dr. Robin Altman had testified that three years is still a "pretty good start." N.T. 1/29/15 at 77. The court responded:

**THE COURT:** You know, Mr. McGraw, I might feel differently about this case if Dr. Altman had come in here and said ["]he's doing really well at Caron [Foundation at Wernersville, Pa.], thinks [sic] are on the upswing, and I'm extremely hopeful,["] but since he's committed this offense he has gone to Caron, he's been removed from Caron for trying to kill himself, he goes and he spends much more time at --

**DEFENSE COUNSEL:** Philhaven.

**THE COURT:** Philhaven, then other people do, comes back to Caron, and is now acting out to the extent that Dr. Altman may want to diagnose him as schizophrenic. Isn't Caron the same kind of facility that the juvenile system would provide for him? And if it's not working in Caron, why is it going to work in the juvenile system?

**DEFENSE COUNSEL:** Well no doubt it is -- it is similar but all of this is preferable to a State Correctional Institute. The public has no interest in seeing this young man, who is just 18 years of age, and inflicted with serious mental illness -- but that illness is by all accounts treatable....

N.T. at 77-78.

On balance, it was the court's determination that factors going against decertification outweighed those offered in support of decertification. In its February 3, 2015, order denying decertification, the court alluded to its

many considerations informing its decision, including: the serious effects of Shull's crime on his 21 year-old victim; community fears about walking in downtown State College at night; the circumstances surrounding the violent crime--including Shull's theft of a $CO_2$ powered replica gun earlier that night; his apparent lying in wait for an unsuspecting pedestrian and positioning of his car to flee the scene; his admission to Dr. Altman that he brandished a gun to scare the victim into turning over her purse; his extensive record of unsuccessful rehabilitation efforts in private facilities offering treatments comparable to those administered in juvenile facilities; and his treating psychiatrists' own lingering questions about Shull's ability to rehabilitate during his minority. We discern no abuse of discretion in the court's thoughtful application of Section 6355(a)(4)(iii) factors to deny Shull's motion to decertify.

Shull next argues that the Commonwealth failed to prove all elements of Robbery at 18 Pa.C.S. § 3701(a)(1)(ii) beyond a reasonable doubt.

> Our standard for evaluating sufficiency of the evidence is whether the evidence, viewed in the light most favorable to the Commonwealth [as verdict winner], is sufficient to enable a reasonable [factfinder] to find every element of the crime beyond a reasonable doubt. [T]he entire trial record must be evaluated and all evidence actually received must be considered, whether or not the trial court's rulings thereon were correct. Moreover, [t]he Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Finally, the trier of fact, while passing upon the credibility of witnesses and the weight to be afforded the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Bryant*, 57 A.3d 191 (Pa.Super.2012) (case citations and quotation marks omitted).

Under Section 3701(a)(1)(ii), a defendant is guilty of robbery if, while in the course of committing a theft, he "threatens another with or intentionally puts him in fear of immediate serious bodily injury." 18 Pa.C.S. § 3701(a)(1)(ii); *Commonwealth v. Jannett*, 58 A.3d 818, 821-22 (Pa.Super. 2012). In *Jannett*, we observed:

> The evidence is sufficient to convict a defendant of robbery under this section "if the evidence demonstrates aggressive actions that threatened the victim's safety." *Commonwealth v. Hansley,* 24 A.3d 410, 416 (Pa.Super.2011), *appeal denied,* 613 Pa. 642, 32 A.3d 1275 (2011). The court must focus "on the nature of the threat posed by an assailant and whether he reasonably placed a victim in fear of immediate serious bodily injury." *Id.* (citations omitted). Additionally, this Court has held that the threat need not be verbal. *Id.*

*Jannett*, 58 A.3d at 821–22.

In support of his position assailing the sufficiency of the evidence, Shull notes Grego testified that in the seven to nine seconds Shull assaulted her he issued no verbal threats, never pointed the gun at her or explicitly referred to the gun, and never looked at her while he dragged her by her hair. Cross-Appellant's brief at 45-46. Additionally, Shull states, Grego was unable to describe precisely how she ended up on her back.

As the trial court found, however, Grego's account allowed the finder of fact to infer Shull acted with the intent to place her in fear of serious bodily injury when he angrily responded to her defiant stance against his

attempt to restrain her. Specifically, Grego described how, under cover of darkness on an isolated street, Shull reacted violently after she tried to shove him out of her way, physically overwhelmed her, and aggressively dragged her by the hair while clutching a gun--with finger on trigger-- directly over her face. According to Grego, seeing the gun at this moment as she lay overpowered and helpless terrified her, and she let out a series of screams described by two seasoned police officers as "blood-curdling" and unlike any scream they had heard in their many years of service. Only upon the arrival of police did Shull release Grego and run for his vehicle. When viewed in a light most favorable to the Commonwealth as verdict winner, this evidence was sufficient to prove the intent element of Section 3701(a)(1)(ii), as Grego's belief that Shull was prepared to inflict serious bodily harm upon her was entirely reasonable under the dire circumstance in which Shull placed her.

In his fourth issue, Shull charges error with the court's evidentiary ruling overruling his objection to testimony recounting his apparent theft of cigarillos from a convenience store and snacks from a different Walmart on the night in question. Specifically, Shull maintains the trial court "considered inadmissible propensity evidence during [his] bench trial[,] evidence that the court openly impugned as irrelevant during trial. "The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes

reversible error." ***Commonwealth v. Glass***, 50 A.3d 720, 724–25 (Pa.Super. 2012) (citation and internal quotation marks omitted).

In general, evidence of uncharged crimes and prior bad acts is inadmissible to demonstrate a defendant's propensity to commit the crime charged.  Our Supreme Court has stated that

> The Commonwealth must prove beyond a reasonable doubt that a defendant has committed the particular crime of which he is accused, and it may not strip him of the presumption of innocence by proving that he has committed other criminal acts. There are, of course, important exceptions to the rule where the prior criminal acts are so closely related to the crime charged that they show, *inter alia*, motive, intent, malice, identity, or a common scheme, plan or design.

***Stafford***, 749 A.2d at 495 (citations omitted).

Here, the notes of testimony reveal that the trial court, sitting as fact-finder in Shull's bench trial, may not have technically sustained defense counsel's relevance-based objection to evidence pertaining to Shull's apparent theft of cigarillos and other items earlier that evening, but nevertheless, the court openly disparaged the probity of such evidence to the point of admonishing the prosecution that it would not consider such evidence in rendering its verdicts, as the following notes of testimony show:

> **PROSECUTOR:**  Okay.  The photograph that depicts him taking the cigarillos –
>
> **DEFENSE COUNSEL:**  Objection.
>
> **THE COURT:**     What's the objection?
>
> **DEFENSE COUNEL:**    It's not relevant.    She's having him testify about a theft.  It's prohibited by rule 404.  I don't know –

- 45 -

> **THE COURT:** The Court will not consider in determining whether the defendant is guilty of counts 1 through 5 on the information that he allegedly committed an offense at some other store. But I don't understand why this case is getting down to the nitty-gritty.
>
> If you think that I'm going to find that he stole a gun an hour later based on the fact that he stole cigarillos and junk food at another store, you are absolutely wrong. But go ahead.
>
> This case is going to go quicker if I just let you put this stuff in that's totally irrelevant. Because I'm telling you, I'm going to ignore it all, but you can put in on.
>
> **PROSECUTOR:** I'll try to move forward, Your Honor.

N.T., 6/17/15, at 104-105.

As our Supreme Court has recognized, [h]armless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. ***Commonwealth v. Hairston***, 84 A.3d 657, 671–72 (Pa. 2014) (citation omitted). Instantly, even if we were to assume, *arguendo*, that the court erred in failing to sustain the defense objection, we would discern no prejudicial effect from the error given the court's unequivocal statement that such evidence would not bear on its fact-finding or verdict on the charges at bar. In addition, the

"uncontradicted evidence of guilt, namely, victim and police testimony identifying Shull as the gun-toting assailant who violently assaulted Grego in a robbery attempt, is so overwhelming, so that by comparison," the errors at issue are insignificant. *See Commonwealth v. Kuder*, 62 A.3d 1038, 1052 (Pa.Super. 2013). Accordingly, Shull's evidentiary ruling challenge is without merit.

In Shull's final issue, he challenges the trial court's ruling refusing to credit him with time-served for his voluntary stay at the Caron Foundation for inpatient rehabilitation. Shull contends, however, that the court was obligated to award him credit starting from the date of the decertification hearing, when the court entered an order requiring him to remain in inpatient rehabilitation.

Specifically, Shull voluntarily entered a 90-day program at Caron one week before his decertification hearing. At the hearing, the court ordered that the "bail bond executed by the defendant on October 16, 2014, is amended to include the condition that Defendant remain at the Caron Foundation in Warrensville, Pennsylvania and not leave that facility unless accompanied by a Caron employee or to return for the next hearing." N.T. 1/14/15 at 135. At the sentencing hearing, the trial court explained it was in consideration of the ongoing provision of treatment already secured by Shull's parents that the court agreed not to revoke bail on condition that Shull not leave Caron. In the court's estimation, therefore, Shull was at

Caron voluntarily and not as a condition of confinement. N.T. 8/11/15 at 26-27.

Employing an abuse of discretion standard of review governing the exercise of sentencing discretion,[14] we note the following:

> The Sentencing Code provides that a defendant shall receive credit for all time spent in custody prior to trial:
>
> ### § 9760. Credit for time served
>
> (1) Credit against the maximum term and any minimum term shall be given to the defendant for all time spent in custody as a result of the criminal charge for which a prison sentence is imposed or as a result of the conduct on which such a charge is based. Credit shall include credit for time spent in custody prior to trial, during trial, pending sentence, and pending the resolution of an appeal.
>
> 42 Pa.C.S.A. § 9760(1). "The principle underlying [Section 9760] is that a defendant should be given credit for time spent in custody prior to sentencing for a particular offense." *Commonwealth v. Fowler*, 930 A.2d 586, 595 (Pa.Super. 2007), *appeal denied*, 596 Pa. 715, 944 A.2d 756 (2008), *quoting* *Commonwealth v. Hollawell*, 413 Pa.Super. 42, 604 A.2d 723, 725 (1992) (citation omitted) (emphasis deleted).

_____

[14] Shull's brief does not contain a "concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence" as required by Pa.R.A.P. 2119(f). However, the Commonwealth has not objected. Therefore, we will not find Shull's discretionary claim to be waived. *See Commonwealth v. Brougher*, 978 A.2d 373, 375 (Pa.Super. 2009) (claims relating to the discretionary aspects of a sentence are waived if an appellant does not include a Pa.R.A.P. 2119(f) statement in his brief and the opposing party objects to the statement's absence; where the appellant has failed to comply with the requirement of 2119(f) but the Commonwealth did not object to the statement's absence, we will not find appellant's claims waived).

The easiest application of [42 Pa.C.S.A. § 9760(1)] is when an individual is held in prison pending trial, or pending appeal, and faces a sentence of incarceration: in such a case, credit clearly would be awarded. However, the statute provides little explicit guidance in resolving the issue before us now, where [the defendant] spent time [somewhere other] than in prison. This difficulty results in part from the fact that neither Section 9760, nor any other provision of the Sentencing Code, defines the phrase "time spent in custody." The difficulty is also a function of the fact that there are many forms of sentence, and many forms of pre-sentencing release, which involve restrictions far short of incarceration in a prison.

*Id.* at 595-596, *quoting* **Commonwealth v. Kyle**, 582 Pa. 624, 632-633, 874 A.2d 12, 17 (2005) (citation omitted). "Courts have interpreted the word 'custody,' as used in Section 9760, to mean time spent in an institutional setting such as, at a minimum, an inpatient alcohol treatment facility." **Id.** at 596, quoting **Kyle**, 582 Pa. at 634, 874 A.2d at 18.

**Commonwealth v. Toland**, 995 A.2d 1242, 1248–49 (Pa.Super. 2010).

Shull points to the procedural history of his case wherein the court placed him on house arrest upon the completion of his 103-day stay at Caron and prior to issuing an order permitting him to enroll at the Linder Hope Center on March 5, 2015, for a neuropsych evaluation and possible ongoing treatment at the facility. N.T. 3/3/15 at 3-12. At a bail status hearing on March 11, 2015, defense counsel asked that Shull be released on bail to permit his enrollment in a partial hospitalization program at another rehabilitation center following his upcoming discharge from the Lindner Center on March 17, 2015. The court denied this request, however, and ordered that upon his discharge from Lindner he be returned to Center

County Correction Facility where he would remain without bail. N.T. 3/11/15 at 3-6.

Shull relies on **Commonwealth v. Cozzone**, 593 A.2d 860 (Pa.Super. 1991), in asserting that he is entitled to credit time for that portion of his inpatient treatment served at the Caron Foundation and the Lindner Hope Center under court order that he not leave such facilities unless accompanied by a facility employee or for the purpose of attending a court hearing. In **Cozzone**, the DUI defendant enrolled in an inpatient rehabilitation program in conformance with an explicit condition of his release on bail. After spending 32 days at the facility prior to his pleading guilty, defendant sought credit for his time served, which the sentencing court denied. We reversed, holding that the defendant only enrolled to avoid pre-trial imprisonment, making his case distinguishable from precedent permitting the denial of credit for pre-trial time served where the defendant voluntarily admitted himself for inpatient treatment. **See**, **e.g.**, **Commonwealth v. Conahan**, 589 A.2d 1107 (Pa. 1991) (holding voluntary admission qualifies as pretrial custody for purposes of "imprisonment" for purposes of awarding time served, but decision whether to award credit resides in sound discretion of sentencing court). In particular, we noted that the District Justice had allowed the defendant to admit himself to an alcohol treatment facility in lieu of being committed to the county prison, and made such admission a condition of his being released on bail. **Cozzone**, 593 A.2d at 866.

In **Toland**, we discussed how precedent distinguishes voluntary from court-ordered pretrial, inpatient admissions when inquiring into whether credit for time served should be granted or denied:

> Looking at these cases together, therefore, it seems that whether a defendant is entitled to credit for time spent in an inpatient drug or alcohol rehabilitation facility turns on the question of voluntariness. If a defendant is ordered into inpatient treatment by the court, *e.g.,* as an express condition of pre-trial bail, then he is entitled to credit for that time against his sentence. **Cozzone**. By contrast, if a defendant chooses to voluntarily commit himself to inpatient rehabilitation, then whether to approve credit for such commitment is a matter within the sound discretion of the court. **Conahan. See also Commonwealth v. Mincone**, 405 Pa.Super. 599, 592 A.2d 1375 (1991) (**en banc**) (trial court may exercise its discretion in determining whether to grant defendant credit towards his mandatory minimum sentence of imprisonment for time voluntarily spent at Gateway Rehabilitation Center, an institutionalized rehabilitation facility) (discussing **Conahan**, **supra**).

**Commonwealth v. Toland**, 995 A.2d 1242, 1250–51 (Pa.Super. 2010).

**Toland** involved a third-time DUI offender who was facing a mandatory one-year prison sentence. After pleading guilty, he asked the court for 354 days' credit for pretrial detention served at several inpatient rehabilitation facilities, noting that the magisterial district judge had ordered that he enter inpatient rehabilitation. Despite the wording in the MDJ's bail information, the sentencing court denied credit for time served, because the defendant had been released on bail and admitted himself only after he was arrested again for DUI one month later. More significantly, however, the record established that the defendant entered inpatient rehab not to avoid

going to jail but, instead, to obtain the best services available to save his life.

In this regard, the sentencing court found it critical that Toland had spent over $100,000 at exclusive, private facilities in Oregon and Arizona. In Oregon, the defendant spent 47 days engaged in group care and therapy relating to his alcohol addiction. When he completed this program, he followed the Oregon staff's recommendation to transfer to the Prescott House in Arizona, where he lived in apartment-style housing, was free to go out, and held a part-time job. The record also showed he had continued his preliminary hearing numerous times before waiving it after he had spent nearly one full year receiving this residential, inpatient treatment. There was nothing about this arrangement that resembled imprisonment or even custody, opined the sentencing court, which described the Prescott House as a "mile high scenic mountain getaway." *Id.* at 1252.

In affirming the court's denial of credit, we agreed that the defendant's situation in no way resembled the "custodial hospital environment" involved in *Conahan*. *Id.* We continued:

> In addition, we cannot ignore the trial court's cogent argument that allowing appellant credit in this case would invite defendants who can afford extended stays in inpatient rehabilitation facilities to "game the system." (Trial court opinion, 1/7/09 at 17-18.) Most defendants cannot afford to pay in excess of $100,000 and continue their cases indefinitely while they "rehab" at addiction facilities in Oregon and Arizona. The trial court states that "If this Court were to allow credit for time spent in rehab in this case, the Court could not look similarly situated defendants in the eye." (*Id.* at 18.).

*Id.*, at 1253.

Here, as was the case in **Toland**, the trial court determined that Shull—with the full emotional and financial support of his family—had voluntarily admitted himself into an exclusive, private rehabilitation facility not to avoid pre-trial detention but, instead, to acquire for himself the best treatment available for his addiction and medical difficulties. Our review of the record supports this determination, and so we decline to find the court abused its exercise of sentencing discretion in refusing to credit time-served for time he spent in voluntary rehabilitation.

Accordingly, we affirm the convictions in the above captioned matters, but vacate sentence and remand for resentencing consistent with this decision. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/13/2016