J-S37021-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
  v.    :
  :
  :
JUAN MORALES   :
  :
  Appellant    :   No. 855 EDA 2022

Appeal from the Judgment of Sentence Entered January 21, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0004004-2017

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
  v.    :
  :
  :
JUAN MORALES   :
  :
  Appellant    :   No. 856 EDA 2022

Appeal from the Judgment of Sentence Entered January 21, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0004444-2017

BEFORE:  BOWES, J., LAZARUS, J., and OLSON, J.

MEMORANDUM BY LAZARUS, J.:       **FILED DECEMBER 16, 2022**

Juan Morales appeals[1] from the judgment of sentence, entered in the
Court of Common Pleas of Philadelphia County, after he was convicted by a
jury of two counts of endangering the welfare of children (EWOC).[2]  We affirm.

---

[1] On May 5, 2022, our Court granted Morales' motion to consolidate the two
appeals, 855 EDA 2022 and 856 EDA 2022.  *See* Pa.R.A.P. 513.

[2] 18 Pa.C.S.A. § 4304(a)(1).

Morales was arrested in North Carolina in May 2017 on a Pennsylvania warrant issued in connection with the alleged sexual assault of two minor female twins (Child 1 and Child 2 — collectively, Children). Children, who were seven years old at the time of the alleged assaults, are the daughters of Morales' long-time paramour, N.S.[3]

Morales was charged with two counts each[4] of rape of a child, involuntary deviate sexual intercourse (IDSI), unlawful contact with a minor, aggravated indecent assault of a child, sexual assault, EWOC, corruption of minors, indecent exposure, indecent assault of a child less than 13 years of age, simple assault, recklessly endangering another person (REAP), and dissemination of explicit sexual materials to a minor.

The trial court set forth the relevant factual history underlying the charges as follows:

> [N.S.] testified that she was in a relationship with [Morales] and he lived in the apartment with her and her children. [N.S.] testified that she sometimes left her twin seven[-]year[-]old daughters home with [Morales] while she went to work. [N.S.] testified that on June 29, 2014[,] around 2:30 a.m., she realized that [Morales] was not in the bed next to her and walked to the living room, where she observed [Morales] on the sofa with his "penis out" and "touching himself" while [Child 1] was balled up with her arms around her knees at her chest on the other end of the couch. [N.S.] explained that she then attacked [Morales] using clenched fists, [] which [Morales] did not resist, until he pinned her down on their mattress, only allowing her to use the bathroom. [N.S.] explained that she did not call the police due to

_____

[3] N.S. and Morales are the parents of a younger daughter who was an infant at the time of the alleged assaults on Children.

[4] Morales was charged under two separate docket numbers, one for each minor victim, CP-51-CR-0004444-2017 and CP-51-CR-0004004-2017.

fear that [Morales] would wake up and hear her on the phone. [N.S.] testified that she was able to leave the house with [C]hildren, after she told [Morales] she was [] going to take the[m] to the flea market. Instead of going to the flea market, [N.S.] said that she went to her mother's house where she first called police and then continued on to St. Christopher's Hospital for Children where she was interviewed by a police officer. On the following day, she and [Children] went to an appointment at [the] Special Victims Unit (SVU) and [] she did not talk to [Children] about what happened with [Morales] or what they were allowed to talk about. [N.S.] stated that she did not communicate or see [Morales] again at that time.

[N.S.] also described moving with [C]hildren to North Carolina in March of 2015, explaining that she lived near and remained in contact with [Morales'] older sister[,] but claimed that she did not know whether [Morales] was living in North Carolina or Philadelphia. [N.S.] described the first time she saw [Morales] in 2016 at his mother's North Carolina home and how she was scared of him during this encounter.

On cross-examination, [N.S.] explained that during their relationship[,] she and [Morales] would have arguments, around [Children], sometimes caused by [Morales'] "w[a]ndering eye for women." [N.S.] testified that before [Children] were interviewed at St. Christopher's Hospital for Children[,] she did not speak to them about what occurred with [Morales]. [N.S.] stated that the Department of Human Services (DHS) spoke to [Children] at the hospital and also visited their house.

Next, Officer Robert Caban testified that he met with [N.S.] and [Children] at St. Christopher['s] Hospital for Children in response to a reported rape in June 2014. Officer Caban recalled that [N.S.] told him about what she saw the night before regarding [Morales'] "private area out" in front of [Child 1]. Officer Caban could not recall if he spoke with [Children] directly. On cross-examination, Officer Caban stated several times that he could not recall specific details regarding his interview with [N.S.] and [Children].

[Child 1] testified that she first met [Morales] when her mom started dating him when she was six or seven. [Child 1] continued[,] stating that [Morales] started living with them when she was seven and sometimes he watched her and [Child 2] while their mother was at work. [Child 1] also testified that [Morales] touched her more than once, describing how [Morales] showed her his phone with "people having sex" on it. [She] described how

[Morales] exposed his private parts to her, touched her private parts, made her put his private part in her mouth, and how he licked her private part over her underwear over the course of [a] few days. [She also] testified that [Morales] put his private part on her front private part once while she was laying down while he moved in a back and forth motion. [She further described] an incident where [Morales] put his private part in her mouth while she was alone with him in the living room. [She also] stated that she did not tell [N.S.] when these things were going on because she was scared and thought something bad might happen if she told.

[Child 1] testified that [N.S.] found out when she came downstairs while [Morales'] private part was exposed and she was on the couch with him. [She] recalled talking with a lady in a room with a camera[,] where she told [the lady] everything that happened to her. [She] also recalled talking with a detective. On cross-examination, [Child 1] testified that when she moved to Candor, North Carolina[,] she lived with just [N.S.] and [her] sisters. [She] explained that she never told anyone at school or in her family what [Morales] was doing to her.

[Child 2] testified that she recognized [Morales] as her [baby] sister'[s] dad who lived with her when she was about seven years old and sometimes watched her when her mom was not home. [Child 2] described one day when she was home alone with [Morales], waking up in [N.S.]'s bed with [Morales'] hand inside her shorts but over her underwear, rubbing on her front private part while he forced her hand on to his exposed private part moving it in a rubbing motion. [She] stated that on the same day and other days[, Morales] showed her videos of men and women in various stages of undress doing "inappropriate things." She could not remember if [Morales] said anything to her while showing her the videos. [She] further testified that [Morales] placed his private part on her back private part and that she saw "slimy stuff" come out of [Morales'] private part when they were alone in the bedroom. [She] recalled speaking with police officers and telling them what happened to her. [She] testified that she never told anyone else about what [Morales] was doing because he asked her not to and that he never threatened to hurt her or her family.

On cross-examination, [Child 2] recalled[,] after going to the hospital[,] speaking to a lady in a room with a table and chair. [She] explained that she never told any teacher, principal, crossing guard, student, police officer at school, or family member

about [Morales] touching her private part. [She] recalled moving to Candor, North Carolina[,] with [N.S.] and [her] sisters and being babysat by [Morales'] sister.

Denise Wilson, Manager of Forensic Services at Philadelphia Children's Alliance (PCA), testified regarding the forensic interview process, [the interview] room, and how parents are not in the room during the interview. Portions of the PCA interviews were intermittently shown to the jury throughout Ms. Wilson's testimony. Ms. Wilson described both [Children] as being reluctant to discuss what happened for fear of making [N.S.] mad because they "told their business." On cross-examination, Ms. Wilson detailed her interactions with [Children] and how it was her opinion that the[y] wanted to give her more information instead of assuming that they were being untruthful.

Next, Detective Brian Meissler testified that he was the assigned investigator on this case and that he met [N.S.] and [Children] at St. Christopher's Hospital for Children, where he spoke to [Children] quickly and took a formal statement from [N.S.] While reviewing his handwritten statement, Detective Meissler admitted that he made a mistake on the form[,] substituting the name Jose for [Morales'] name Juan and that there was no mention during the interview with [N.S.] of another individual.

Detective Meissler explained that he typically writes while conducting interviews and when the interview is finished he "ask[s] them to read it . . . over and sign it, and sign and date the last page." Detective Meissler explained that when he completed [his] interview with [N.S.] he followed this procedure with her and since there were no initials where changes were made[,] he believed "she did not make any corrections." Detective Meissler recalled [Child 1's] second interview with him at the police station, noting how at the end of the interview she wrote "she sail [sic] him red hand did [sic]" above her signature. Detective Meissler stated his belief that [Child 1] was withholding information during the interview.

On cross-examination, Detective Meissler described what a rape kit is, the procedures [for] obtaining any evidence to be placed in a rape kit, and how no biological evidence of the offender was found in [Children's] rape kits. Detective Meissler explained why he continued questioning [Child 2] after she answered "no" to the question "Did [Morales] ever touch you with his penis?" testifying that it was his belief based on his 15 years of experience that she "was withholding information that she didn't want to talk about[.]"

The Commonwealth made two stipulations before resting [its] case-in-chief; the first stipulation concerned the date and time [Children] were seen at St. Christopher's Hospital for Children and the second stipulation stated [Morales'] date of birth as October 13, 1986.

For the defense, [Morales'] current girlfriend, Samantha Rivera, testified that when she met [Morales,] he was living in North Carolina with his mother and [N.S.]. Ms. Rivera stated that [N.S.] told her that the allegations against [Morales] were not true. On cross-examination, Ms. Rivera again explained that when she asked [N.S.] if the allegations against [Morales] were true, [N.S.] responded "no" and that "she could not talk about it."

Lastly, [Morales] testified that, on June 28, 2014, he attended a family party with his then-girlfriend, [N.S.], and [C]hildren. During the party, he and [N.S.] got into an altercation. [Morales] claimed that after arriving home[, N.S.] wanted to continue to argue[. I]nstead[, Morales] ignored her until he thought she was asleep while he smoked, played x-box, and texted on his phone. After leaving the bedroom to get something to drink[, Morales] explained that [N.S.] confronted him with his cell phone[,] asking him to explain text messages[,] and when she did not like his response, swung [at] him and threw the phone at him, hitting him in the nose. [Morales] continued describing how he pushed and held [N.S.] down until she calmed down and then they both went to sleep. The next morning[, N.S.] suggested they go to [the] flea market and they all got dress[ed] to go, but [N.S.] drove off without [Morales] after he went to retrieve the baby's sippy cup.

[Morales] stated that he called [N.S.] a few times[,] but she did not answer and later he received a threatening phone call from [N.S.]'s brother calling him a pedophile and threatening to kill him. [Morales] said that he was scared so he contacted his mother to tell her what was going on and then traveled with his mother to Charlotte, North Carolina[,] where he stayed until he was arrested in 2016. [Morales] also detailed [N.S.]'s move with [C]hildren to Candor, North Carolina[,] about five or six months after he moved to Charlotte. During this time, he claimed that [N.S.] would visit him in his mother's home and was given a key to his mother's house. Lastly, [Morales] stated that he never sexually assaulted [Children].

On cross-examination, [Morales] explained that[,] through family members[,] he heard that authorities were looking for him and learned about the nature of the allegations against him. [Morales]

explained that once [N.S.] and [C]hildren moved to North Carolina[,] he resumed his romantic relationship with [N.S.] and would . . . keep[] his distance from [Children].

Trial Court Opinion, 10/25/19, at 2-9 (citations to notes of testimony omitted).

After a four-day jury trial held in August 2018, Morales was acquitted of all charges except two counts of EWOC; the jury specifically found that there was a "course of conduct" with regard to the EWOC charges based on "diverse dates between 2012 through 2014." **See** Verdict Slip, 8/24/18; Commonwealth's Criminal Information, 5/16/17, at 1; **see also supra** n.3; **infra** n.17. On November 21, 2018, the court sentenced Morales to two consecutive terms of 2½ to 5 years' imprisonment. Morales filed post-sentence motions; they were deemed denied by operation of law. Morales filed timely notices of appeal for each docket number below and complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.[5] On March 2, 2021, our Court vacated Morales' judgment of sentence, affirmed his convictions, and remanded the case to the trial court for resentencing on the EWOC charges, to be graded as misdemeanors of the first degree where the trial court failed to instruct the jury on "course of conduct" and, thus, was not able to support the grading of EWOC as a third-degree felony. **See Commonwealth v. Morales**, Nos. 1111 & 1112 EDA 2018 (Pa. Super. filed March 1, 2021) (unpublished memorandum decision). On June 17, 2021, the Commonwealth filed a

_____

[5] The trial court opinion inaccurately states that Morales filed a Post-Conviction Relief Act (PCRA) petition in December 2018, when, in fact, he never filed such a petition. Rather, Morales filed a direct appeal from his judgment of sentence following the denial of post-sentence motions.

petition for allowance of appeal with the Pennsylvania Supreme Court that was denied on October 20, 2021. *See Commonwealth v. Morales*, No. 272 EAL 2021 (Table).

On remand, the trial court resentenced Morales on January 21, 2022; the EWOC charges were graded as a first-degree misdemeanor. At the resentencing hearing, Morales' attorney noted because the court had imposed a standard-range guidelines sentence at the original sentencing hearing and because there were no aggravating circumstances or evidence that Morales had misbehaved in prison since the time he was originally sentenced, a standard-range sentence was appropriate. N.T. Resentencing Hearing, 1/21/22, at 5. The Commonwealth, however, requested that the court depart from the guidelines and impose the same sentence as it had originally imposed upon Morales. Because of the new grading of the EWOC offenses, however, the same sentence would be considered an outside-the-guideline-range sentence. *Id.* at 6. To support the guideline departure, the Commonwealth offered four reasons: (1) allegations of sexual abuse committed by Morales; (2) Morales' actions when he was discovered by Children's mother; (3) Morales' lack of remorse at time of original sentencing; and (4) the potential impact that Morales' actions will have on Children. *Id.* at 6-9.

Morales exercised his right of allocution at resentencing, noting that he had participated in two prison programs since his incarceration—an intense community rehabilitative program and a domestic violence program. *Id.* at 11-12. Morales testified that the programs "taught [him] how to control [his]

anger and [how to] be a humble person and to . . . look at [him]self in the other person's shoes." *Id.* at 12. Finally, Morales told the sentencing judge that "he has a job waiting for [him] . . . at a Metro PCS store" when he is released from prison, he wants to be able to "help [his] kids' mother" financially, and he has "done a lot of growing up these past 5 years since [he's] been incarcerated." *Id.* at 12-13.[6]

The court ultimately imposed a term of imprisonment of 2½-5 years on CP-51-CR-0004444-2017, and a consecutive sentence of 2½-5 years' imprisonment on CP-51-CR-0004004-2017—the same sentence that it had originally imposed upon Morales.[7] The sentencing judge noted that although the facts had not changed since the last sentencing proceeding, and that, while she was "happy to learn that [Morales] was not wasting [his] time and that [he's] done a lot of programming [in jail,]" she still believes that "[she] was right the first time and [is] going to be right this time." *Id.* at 14. The court, however, noted on the record that due to the change in grading of the charges, the sentence now was outside of the Sentencing Guidelines, but still within the statutory maximum. *See id.* at 18-19; *see also* 204 Pa.Code §

_____

[6] Morales also told the sentencing judge that he already had been denied parole because he was determined "to still [have] high levels of being a risk to the community." *Id.* at 17-18.

[7] The court also imposed the same conditions as those attached to Morales' original sentence, which included mandatory court costs, supervision by Sexual Offender's Unit, credit for time served, and the condition that Morales have "NO UNSUPERVISED CONTACT with minor children." Guilty Re-Sentencing Order, 1/21/22, at 1 (emphasis in original).

303.16(a) (Basic Sentencing Matrix), Pennsylvania Commission on Sentencing, Sentencing Guidelines, 7th Ed. Amend. 1;[8] 18 Pa.C.S.A. § 1104(1) ("A person who has been convicted of a misdemeanor may be sentenced to imprisonment for a definite term which shall be fixed by the court and shall be not more than . . . [f]ive years in the case of a misdemeanor of the first degree.").

Morales filed a post-sentence motion arguing that the court: did not state which facts of the case caused the court to deviate from the suggested minimum guideline sentence; failed to acknowledge that the numerous sexual assault offenses that [Morales] had originally been charged with were not proven beyond a reasonable doubt and that [Morales] was acquitted of all charges except two counts of EWOC; abused its discretion by not stating sufficient reasons on the record for deviating from the suggested guideline minimum sentence and by imposing consecutive sentences in light of mitigating circumstances; and, failed to give proper weight to mitigating circumstances. Post-Sentence Motion, 1/30/22, at 1-2. On February 17, 2022, the trial court denied Morales' motion.

---

[8] The Sentencing Matrix indicates that for an OGS of 5 and PRS of 5, as in the instant case, a standard-range sentence is 12-18 months' minimum confinement, +/- 3 months. Here, Morales' minimum term of incarceration was 30 months. Thus, it falls above the aggravated range and outside of the Guidelines.

Morales filed timely notices of appeal[9] and a court-ordered Pa.R.A.P.

1925(b) concise statement of errors complained of on appeal. Morales raises

the following issues for our consideration:

(1) Did the [c]ourt abuse its discretion at sentencing where it did not state sufficient reasons to deviate from the suggested guideline minimum sentence?

(2) Did the [c]ourt abuse its discretion in sentencing [Morales] to consecutive terms of imprisonment where there were mitigating circumstances and the imposition of a consecutive sentence presents a substantial question that the sentence is inappropriate because it is contrary to the norms underlying the Sentencing Code?

(3) Did the [c]ourt abuse its discretion in sentencing [Morales] to the maximum sentence permitted for EWOC[,] graded as an M[-]1[,] where the imposition of the maximum sentence for EWOC [(M-1)] presents a substantial question that the sentence is inappropriate because it is excessive, manifestly unreasonable[,] and contrary to the norms underlying the Sentencing Code[?]

Appellant's Brief, at 6.

Morales' claims implicate the discretionary aspects of his sentence. "It

is well settled that, with regard to the discretionary aspects of sentencing,

there is no automatic right to appeal." *Commonwealth v. Austin*, 66 A.3d

798, 807-08 (Pa. Super. 2013) (citation omitted).

Before [this Court may] reach the merits of [a challenge to the discretionary aspects of a sentence], we must engage in a four[-]

_____

[9] Morales has complied with the dictates of *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018), which requires the filing of "separate appeals from an order that resolves issues arising on more than one docket." *Id.* at 977. *See also Commonwealth v. Johnson*, 2020 PA Super 164 (Pa. Super. filed July 9, 2020) (en banc) (revisiting *Walker* holding) and *Commonwealth v. Larkin*, 2020 PA Super 163 (Pa. Super. filed July 9, 2020) (en banc) (same).

part analysis to determine: (1) whether the appeal is timely; (2) whether Appellant preserved his issue; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence [see Pa.R.A.P. 2119(f)]; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code . . . . [I]f the appeal satisfies each of these four requirements, we will then proceed to decide the substantive merits of the case.

*Id.* (citation omitted). After reviewing the record, we find that Morales has complied with the first three requirements. In addition, we also find that Morales' Rule 2119(f) concise statement raises a substantial question. *See Commonwealth v. Caldwell*, 117 A.3d 763 (Pa. Super. 2015) (en banc) (finding claim that imposition of consecutive sentences was unduly excessive, together with claim that sentencing court failed to consider mitigating factors, raised substantial question). Thus, we may review Morales' sentencing claims.

Our standard of review when deciding a sentencing claim is as follows:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely to be an error in judgment. Rather the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias[,] or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Shull*, 148 A.3d 820, 831 (Pa. Super. 2016) (citation omitted). Moreover,

[i]t is well-established that the [Pennsylvania] Sentencing Guidelines[, 204 Pa.Code § 303 *et seq.*, ]are purely advisory in nature. The Guidelines do not alter the legal rights or duties of the defendant, the prosecutor[,] or the sentencing court. The Guidelines are merely one factor among many that the court must consider in imposing a sentence. []

- 12 -

> The defendant has no "right" to have other factors take pre-eminence or be exclusive; therefore, to have the Guidelines considered, whatever they may provide does not change his rights. Likewise, the prosecutor has no "right" to have a particular sentence imposed. Most important, the court has no "duty" to impose a sentence considered appropriate by the Pennsylvania Commission of Sentencing. The Guidelines must only be considered and, to ensure that such consideration is more than mere fluff, the court must explain its reasons for depart[ing] from them.

> [D]espite the recommendations of the Guidelines, "the trial courts retain broad discretion in sentencing matters, and therefore, may sentence defendants outside the Guidelines." The only line that a sentence may not cross is the statutory maximum sentence.

*Commonwealth v. Yuhasz*, 923 A.2d 1111 (Pa. 2007) (citations omitted).

Finally, "[i]f a trial court departs from the sentencing recommendations contained in the sentencing guidelines, it must provide a contemporaneous written statement of the reason or reasons for the deviation." *Commonwealth v. Mouzon*, 812 A.2d 617, 621 (Pa. 2002) (citing 42 Pa.C.S.A. § 9721(b)). *See also* 204 Pa. Code § 303.1(d).

"When a sentence is vacated and the case is remanded to the sentencing court for resentencing, the sentencing judge should start afresh." *Commonwealth v. Losch*, 535 A.2d 115 (Pa. Super 1987). In *Commonwealth v. Jones*, 640 A.2d 914 (Pa. Super. 1994), our Court stated:

> Reimposing a judgment of sentence should not be a mechanical exercise. Given the important nature of the interests involved, the judge at the second sentencing hearing should reassess the penalty to be imposed on the defendant[—]especially where defense counsel comes forward with relevant evidence which was not previously available. Thus, [a defendant's] conduct since the prior sentencing hearing is relevant at resentencing. The sentencing judge must take note of this new evidence and

- 13 -

reevaluate whether the jail term which [the defendant] received is a just and appropriate punishment.

*Id.* at 919-20, citing *Losch*, 535 A.2d at 122-23.

Instantly, the sentencing judge *did* take note of new evidence at Morales' resentencing hearing. Specifically, the judge took into account the fact that Morales had completed two rehabilitative programs since being incarcerated five years prior. N.T. Resentencing Hearing, 1/21/22, at 17 ("However, I am taking into consideration everything that you told me about what you've been doing while you've been incarcerated."). The judge noted Morales' progress and commended him for having "learned something [by] attend[ing] and complet[ing the] programs." *Id.* However, even considering this new evidence, the sentencing judge highlighted the fact that "the nature of [Morales'] case [is] difficult," *id.* at 18, and that just because the grading of the offenses may have changed, the same sentence was still appropriate under the circumstances. *Id.* at 18-19.

Additionally, the sentencing judge was aware of the correct guidelines "starting point" before she imposed Morales' outside-the-guideline resentence. *See id.* at 4; *see also Commonwealth v. Johnakin*, 502 A.2d 620 (Pa. Super. 1985) (court must determine correct starting point in guidelines before sentencing defendant to sentence outside guidelines). The sentencing judge also noted that, in resentencing Morales, she considered the young age of the victims, "who had a familial relationship with [Morales], [Morales'] reaction[] when he was discovered by the [Children's] mother; and [Morales'] lack of remorse." Trial Court Opinion, 5/6/22, at 12.

- 14 -

After a review of the record, we conclude that the sentencing court did not abuse its discretion when it resentenced Morales. *Shull*, *supra*. The court considered, among other things, the facts of the case, Morales' character and prior criminal record, and any intervening mitigating evidence since he had been incarcerated on the instant offenses. *See Commonwealth v. Griffin*, 804 A.2d 1, 10 (Pa. Super. 2002) (record as whole must reflect sentencing court's consideration of facts of case and defendant's character and "should refer to the defendant's prior criminal record, his age, personal characteristics[,] and his potential for rehabilitation"). The court likewise balanced the factors enumerated in section 9721(b) of the Sentencing Code and stated, on the record, why it decided to impose an outside-the-guideline sentence. *Cf. Commonwealth v. Byrd*, 657 A.2d 961 (Pa. Super. 1995) (judgment of sentence vacated where sentencing court failed to state, in defendant's presence, permissible range of guideline sentences and did not indicate it was sentencing defendant outside of guidelines or provide reasons for deviation).

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/16/2022

- 15 -