J-S35022-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JORDON S. SEELYE | : | |
| | : | |
| Appellant | : | No. 248 MDA 2024 |

Appeal from the Judgment of Sentence Entered October 11, 2023
In the Court of Common Pleas of Northumberland County Criminal
Division at No(s):  CP-49-CR-0000270-2022

BEFORE:  PANELLA, P.J.E., MURRAY, J., and KING, J.

MEMORANDUM BY MURRAY, J.:                    **FILED: OCTOBER 25, 2024**

Jordon S. Seelye (Appellant) appeals from the judgment of sentence entered after a jury convicted him of one count each of aggravated assault, simple assault, recklessly endangering another person (REAP), and tampering with physical evidence.[1]  After careful review, we affirm.

The trial court briefly summarized the facts underlying this appeal:

Two friends, shooting pool in a bar, tried to lift the [pool] table as the balls became stuck.  This upset the bartender[.  T]hings got heated and they were asked to leave.  Three other patrons met them outside[;] there was an exchange of words[;] and an individual named [Robert] Byers [(Byers)] "sucker punched" the victim, [Kenneth] Banghart [(Banghart)].  [Appellant] was about five feet away as Byers and Banghart began fighting.  The fight only lasted a few minutes, but at one point Banghart thought he

---

[1]  **See** 18 Pa.C.S.A. §§ 2702(a)(1), 2701(a), 2705.  The jury acquitted Appellant of attempted murder, aggravated assault with a deadly weapon, and possessing an instrument of crime (PIC).  **See** 18 Pa.C.S.A. §§ 901(a), 2702(a)(4), 907, 4910.

was punched in the ribs[,] when actually he had been stabbed in the stomach and shoulder by [Appellant].

Trial Court Opinion, 4/30/24, at 1. Appellant subsequently went to the apartment of Kalani Betts (Betts), where he changed clothes and placed a knife and other articles in cleaning solution.

A jury subsequently convicted Appellant of the above-described charges. On October 11, 2023, the trial court sentenced Appellant to 6-12 years in prison for his conviction of aggravated assault.[2] For his conviction of REAP, the trial court imposed a concurrent prison term of 11-24 months. For his conviction of tampering with evidence, the trial court sentenced Appellant to a concurrent prison term of 4-24 months. Appellant filed post-sentence motions, which the trial court denied. Thereafter, Appellant filed the instant timely appeal. Appellant and the trial court have complied with Pa.R.A.P.1925.

Appellant presents four issues for our review:

1. Did the [trial court] err in [] holding that the evidence presented at trial was sufficient to sustain the Commonwealth's burden to prove [Appellant's] guilt beyond a reasonable doubt as to … [a]ggravated [a]ssault?

2. Did the [trial court] err in holding that the weight of the evidence supported the verdict of the jury in this matter?

3. Did the [trial court] err in its denial of [Appellant's] Motion *in Limine* as to the testimony of [] Betts, as the same was so prejudicial and lacked credibility to such a degree that it deprived [Appellant] of his due process rights to a fair trial?

---

[2] Appellant's conviction of simple assault merged at sentencing.

4. Did the [trial c]ourt err in its application of the deadly weapon enhancement at sentencing?

Appellant's Brief at 3.

Appellant first challenges the sufficiency of the evidence underlying his conviction of aggravated assault. *Id.* at 14. Appellant directs our attention to testimony indicating his mere presence at the scene, "lurking." *Id.* Appellant argues, "[d]espite [Appellant] never coming closer than five feet away from the victim, the Commonwealth continues to maintain that somehow [Appellant] twice stabbed [] Banghart." *Id.* According to Appellant, "[t]his conclusion strains all credulity." *Id.*

Appellant directs our attention to the testimony of Banghart, and Appellant's cohort, Blake Dunbar (Dunbar). *Id.* at 15. According to Appellant, "both testified that [Appellant] remained five feet from the altercation and was not really involved." *Id.* Appellant also points out the absence of any testimony that Appellant had a knife. *Id.* Appellant argues, "[w]hile the victim was in fact stabbed, it is completely unreasonable to assume that the man [who] by all accounts remained five feet away from the tussle was the one who did the stabbing." *Id.* (footnote omitted). Appellant asserts the Commonwealth failed to present any evidence beyond his mere presence at the scene. *Id.*

Appellant asserts that all witnesses, including the victim, testified Appellant "never got closer than five feet from the victim." *Id.* at 16. Appellant maintains that no witness saw him with a knife. *Id.* at 17.

[Appellant] asserts "there was no testimony or evidence presented to suggest that [he] engaged in any act that could form the basis of an aggravated assault conviction." *Id.*

We initially observe that a challenge to the sufficiency of the evidence presents a question of law for which our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Johnson*, 236 A.3d 1141, 1152 (Pa. Super. 2020).

> The standard we apply in reviewing the sufficiency of the evidence is whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Smith*, 97 A.3d 782, 790 (Pa. Super. 2014) (citations omitted).

A person is guilty of aggravated assault if he "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly, or recklessly under circumstances manifesting extreme indifference to the value

of human life[.]"  18 Pa.C.S.A. § 2702(a)(1).  Serious bodily injury is defined

as, "bodily injury which creates a substantial risk of death or which causes

serious, permanent disfigurement, or protracted loss or impairment of the

function of any bodily member or organ."  *Id.* § 2301.

At trial, the Commonwealth presented the testimony of Banghart, the

victim.  Banghart testified that on February 26, 2022, at around 6:00 p.m.,

he visited Danley's Bar in Sunbury, Pennsylvania.  N.T., 6/12/23, at 23-24.

According to Banghart,

> [w]e were just going out for a Sunday fun day.  And [we] went
> out for a couple of beers.  And [we] went to the Legion in Sunbury,
> and decided we were going to go to Laughters [bar], but they were
> closed.  So then we left there and went down to Danley's and
> stayed there for the rest of our time….

*Id.* at 24.  While at Danley's Bar, Banghart played pool with Greg Bingaman

(Bingaman).  *Id.*  Banghart explained that,

> when we were shooting pool, the balls got stuck in the pool table.
> So [Bingaman] picked up the end of the pool table and let it slam
> a little bit so the ball would get unstuck, but it didn't work.  The
> bartender got mad, came out[,] and started yelling at
> [Bingaman].  And we tried to [de]fuse the situation, but things
> got heated.  And that's really what started the whole thing over a
> pool game.
>
> ….
>
> We were eventually told to leave.  And then … we went outside.
> And that's when the three gentlemen were waiting for us,
> [Appellant], Byers and Dunbar, at our vehicles….

*Id.* at 24-25.

Banghart testified that when he was approximately 12-15 feet from his vehicle, Appellant "approached us holding his phone saying he was recording us, that we shouldn't get into our vehicles because we were drinking." *Id.* at 25-26. Banghart described Appellant as wearing tan pants and a black hoodie. *Id.* at 28. According to Banghart, Appellant was approximately five or six feet away from him. *Id.*

Banghart testified:

[Appellant] said, "You[] guys were drinking, don't get in your cars," … along those line[s]. And we both said, "Mind your own business." And that is when Dunbar and Byers came around the corner of the car. And they came more directly towards me, and [Appellant] was still recording. And then … Byers sucker punched me. And I don't remember much, other than just tussling around with them and trying to get them off of me. Byers ended upon on the ground. And then [Bingaman] tripped over him. And then that's when the evidence shows [Appellant] coming over top and getting me.

*Id.* at 26.

Banghart testified that immediately after the fight,

I remember standing there in the parking lot, looking down the road, seeing Dunbar and Byers and [Appellant] to my left. And then saying that, "I see your faces. I see your faces. I remember your faces." And I just thought I took a good shot to the ribs. I thought I was punched. I didn't even know I was stabbed until I was in the ambulance. … And then they took me into the bar and cleaned me up. Helped me with … the laceration to my head. They didn't even know I was bleeding profusely out of my shoulder until we got in the ambulance. So lucky I didn't die right there.

*Id.* at 29.

Banghart reviewed surveillance videos of the incident while on the stand. *Id.* Banghart testified, while viewing the video, that during the fight,

- 6 -

while "the others" are "on the ground[;]" Appellant "came over the top." *Id.* at 39, 40. Banghart testified that as a result of his wound, he was hospitalized for five days in an intensive care unit. *Id.* at 41. According to Banghart, he had "[s]tomach surgery to repair my stomach. My stomach got hit. … It was a half inch away from hitting a major artery." *Id.* During cross-examination, Banghart acknowledged he never saw a knife during the altercation. *Id.* at 47.

Bingaman testified regarding the events that followed their departure from Danley's Bar:

> [W]e noticed a gentleman standing near my truck. So once we got to the truck, he was like, … "What's going on?" And it was this individual here threatening to call the cops. It looked like he was trying to take pictures of my license plate.
>
> ….
>
> Next thing you know, we're talking … like maybe a minute. … And all of a sudden, there is [*sic*] two gentlemen walking up, approaching us from behind, which would be … [] Dunbar and [] Byers. And from there … it was Byers who said, "Which one of you was giving the bartender trouble?" So at that point, he was right in [Banghart's] face. And I'm just kind of keeping my eye – something is going to go down here. And I heard a crack, which was him sucker punching [Banghart] in the face.

*Id.* at 53. Bingaman continued:

> [It] was Byers that hit him. They started tangling around a little bit. And I'm not looking at them. I'm trying to make sure I'm not about to get jumped or anything. Well, I didn't realize that [Banghart] got him off him … he threw [Byers] to the ground, which is behind me.
>
> ….

… And so that left Dunbar right here.  And [Appellant] was … right next to my truck.  So I stepped back … to guard myself.   And I fell backwards not knowing that Byers … was getting up, but I tripped over him.  And once I tripped over him, I kind of landed on my butt.  I was trying to get up, and Dunbar cracked me a shot before I could get up.   And then Byers had already just like speared me from behind and was just – drilling in on me, which caused me to fall.  So I grabbed a hold of Dunbar and we fell to the ground.

….

I am at this point dealing with two of the three, which would have been [] Dunbar and [] Byers.

*Id.* at 54-55.   According to Bingaman, "there was only [Appellant] and [Banghart] left.  So … I got two guys I'm dealing with.  So I'm not watching what they're doing."  *Id.* at 55.

Bingaman continued,

I felt the small guy, Byers, get off of my back.  And [Dunbar] … he let loose, so I just kind of let loose and tried to get up so I could see what is going on.  By that time, Byers and Dunbar are walking away, and [Appellant] was standing there.  A female came out of the bar.  And [Appellant] was … for whatever reason, still hanging out….

*Id.* at 55.  Bingaman, too, viewed the video and described "this individual's arm come up and over in a manner such as that; not like a punch[.]" *Id.* at 62.  Bingaman described the individual as wearing tan pants and a black shirt. *Id.*

Debra Danley (Danley), the owner of Danley's Bar, also testified. *Id.* at 94.  Danley testified that she was "called over to an incident that was going

on with my barmaid." ***Id.*** at 94. Danley testified that she asked Bingaman

to leave the bar, following his altercation with a barmaid. ***Id.*** Danley testified:

> I walked [Bingaman and Banghart] to the door. And I went to the side window and looked out to see if they were getting in their vehicle. And all I observed was a fist going up this way. Whose it was, I do not know.

***Id.*** at 95.

Kalani Betts (Betts) testified that on February 6, 2022, she lived above

Laughters bar. ***Id.*** at 68-69. Betts indicated that her boyfriend, Dunbar, was

friends with Appellant. ***Id.*** at 68. According to Betts, Appellant

> had went out with Dunbar. And they went to Danley's Bar to shoot pool. And from there, I got a phone call … that I was to let [Appellant] in.

***Id.*** at 69. Betts stated this took place at around 7:00 p.m. ***Id.*** She further

testified that when Appellant arrived, he "had blood on his clothing, and he

had a cut on his hand." ***Id.*** Betts stated Appellant "had a laceration on his

hand, as well as blood on his hands." ***Id.*** at 70. Betts described Appellant as

"very shaken up." ***Id.***

Betts testified Appellant "cleaned himself up, and told me that … they

would explain everything when [Dunbar] had got back." ***Id.*** When asked to

describe how Appellant had cleaned himself, Betts testified: "[h]e placed []

cleaner in a Ziploc bag, along with his rings and the knife and everything."

***Id.*** Betts explained that she had seen Appellant with the same knife earlier

that evening. ***Id.*** According to Betts, Appellant placed the knife in the Ziploc

bag with "a mixture of like hand sanitizer, rubbing alcohol, just stuff that was laying around in the room." *Id.* at 71.

Betts further testified regarding a statement made by Appellant:

He told me when he got there, that … there was a fight, and that he believed at the time that he had stabbed somebody in the face, is what he had admitted to me. But I found out, obviously, later that that was not the case.

*Id.* at 73.

Betts also testified,

when [] Dunbar [] came back, [Appellant] and [] Dunbar stripped down … out of their clothing, and changed into new clothing. And put them into a black duffel bag. And [Appellant] had taken them with him when he left.

*Id.* at 71. Betts recalled Dunbar "had no blood on him." *Id.* The plastic bag containing the knife and other items remained on Betts's dresser until the next morning. *Id.* at 72. Appellant returned the next morning, retrieved the bag from Betts's dresser drawer, and took it with him. *Id.* Appellant also returned Dunbar's belongings. *Id.* Betts confirmed she had two 2022 convictions for unsworn falsification and false reports.[3] *Id.* at 73.

_____

[3] Sunbury Police Sergeant Travis Bremigen (Sgt. Bremigen) testified that on February 6, 2022, while off-duty, he was called to the stabbing scene. N.T., 6/12/23, at 101. Sgt. Bremigen testified he subsequently interviewed Betts on February 9, 2022. *Id.* at 109. However, the audio and video recordings of that interview were lost when the police station moved to a different location. *Id.* at 110.

Dunbar testified regarding the altercation. *Id.* at 81. Dunbar stated that, as he walked away from the altercation, he received a phone call from Appellant. *Id.* at 81. According to Dunbar, Appellant stated,

> "I caught him pretty good. I got some blood on me. I need to change." So I told him that he could go to my apartment, because that is where I was going next.

*Id.* at 82.

Dunbar arrived at his apartment approximately 15-20 minutes later. *Id.* Upon arriving at the apartment, Dunbar observed that Appellant was wearing a different shirt and was changing his pants. *Id.* at 82-83. According to Dunbar,

> [f]rom there we proceeded to put any jewelry that we had into a bag. … [Appellant] had rings. And I had seen a knife in the bag. Clear solution. I want to say it was about a sandwich baggie….

*Id.* at 83.

The evidence, viewed in a light most favorable to the Commonwealth, established that Appellant attempted to and did cause serious bodily injury to Banghart, and did so "knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S.A. § 2702(a)(1). The evidence established more than Appellant's mere presence at the scene. The testimony confirmed Appellant possessed a knife before and after the altercation; Appellant physically engaged with Banghart and suffered a cut to his hand; Appellant had blood on his clothing and hands following the incident; and Appellant took steps to clean evidence from a knife

and clothing following the altercation. Moreover, the jury viewed the surveillance recording of the incident.

In its opinion, the trial court addressed and rejected Appellant's challenge to the sufficiency of the evidence:

> The first claim is that the evidence was insufficient to establish [Appellant's] conviction for aggravated assault. **This argument is belied by the fact that the jurors had the opportunity to view surveillance videos capturing the melee.** The tapes showed [Appellant] making swinging action at Banghart with his arm during the fight, and the angle of attack being consistent with the wounds['] locations. Another witness identified [Appellant] as stabbing the victim.
>
> Moreover, [Appellant] later corroborated his identity on the videos as to his use of the knife[,] by bragging "I got him pretty good, I need to change." He was seen with blood on his pants and sweatshirt.

Trial Court Opinion, 4/30/24, at 1-2 (emphasis added). The record supports the trial court's findings and conclusion. As such, Appellant's challenge to the sufficiency of the evidence underlying his conviction of aggravated assault merits no relief.

Appellant next argues the jury's verdict, finding him guilty of aggravated assault, is against the weight of the evidence.[4] Appellant's Brief at 18. Appellant argues "[t]he unequivocal testimony of all three (3) eyewitnesses was that [Appellant] stayed five to six (5-6) feet away from the alleged victim and was not seen with a knife." *Id.* at 19. Appellant asserts, "[t]he trial court

---

[4] Appellant preserved this issue in his post-sentence motion.

seemingly ignores this essential testimony, instead relying upon the surveillance video to support its conclusion that the jury's verdict did not shock [its] conscious [*sic*]." **Id.** Appellant directs our attention to the victim's testimony that Appellant "stayed approximately six feet away." **Id.**

Appellant also argues that, although the victim testified that he was stabbed twice, Bingaman testified regarding only a single overhand motion by the assailant. **Id.** Appellant directs our attention to medical testimony that Appellant suffered two wounds, not one. **Id.** at 20. According to Appellant, "a single overhand motion cannot result in two stab wounds to both the upper and lower part of the body of another." **Id.**

We review a challenge to the weight of the evidence under the following standard:

> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.
>
> ….
>
> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> ….

- 13 -

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Clay*, 64 A.3d 1049, 1054-55 (Pa. 2013) (quotation marks and citations omitted). **In order for an appellant to prevail on a challenge to the weight of the evidence, "the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court."** *Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa. Super. 2003) (quotation marks and quotations omitted).

*Commonwealth v. Rodriguez*, 174 A.3d 1130, 1139-40 (Pa. Super. 2017) (emphasis added).

Instantly, although Appellant argues his mere presence at the scene, the evidence established otherwise. The Commonwealth presented evidence that Appellant possessed a knife before and after the altercation. Appellant further attempted to conceal his involvement, by soaking the knife in cleaning solutions and washing his clothing of blood. Appellant admitted to Dunbar that he struck the victim. Finally, the jury viewed a recording of the incident itself. The evidence not "so tenuous, vague and uncertain that the verdict shocks the conscience of the [C]ourt." *Sullivan*, 820 A.2d at 806. We discern no abuse of the trial court's discretion in rejecting Appellant's weight challenge. As such, Appellant's second issue merits no relief.

In his third issue, Appellant challenges the trial court's denial of his motion *in limine* to preclude Betts's testimony regarding his confession.

Appellant's Brief at 20. Appellant argues that Betts's testimony "was so prejudicial and lacked [] credibility to such a degree that it deprived [Appellant] of his due process right to a fair trial." *Id.* at 21. According to Appellant, police made audio and video recordings of Betts's interview. *Id.* However, Appellant argues, Sgt. Bremigen testified at the omnibus pretrial hearing and at trial that Betts did not describe an admission of guilt by Appellant. *Id.* Appellant points out Sgt. Bremigen's testimony that "his report was a contemporaneous record of said interview and no such admissions were referred to therein." *Id.*

Appellant claims that Betts first testified regarding Appellant's admissions at the omnibus pretrial hearing. *Id.* When Appellant requested the audio and video recordings of Betts's police interviews, however, the Commonwealth claimed the recordings were lost. *Id.* Appellant argues that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), by not notifying him of Betts's statements regarding his confession. Appellant's Brief at 21-22. Appellant claims that the video would be exculpatory, as Sgt. Bremigen testified that Betts said nothing about a confession by Appellant. *Id.* at 22 n.3. Appellant argues Betts's testimony was highly prejudicial, "given the sparsity of other evidence[.]" *Id.* at 23. Appellant argues, "there can be no doubt that a trial with [] Betts' testimony and one without absolutely would have yielded different results."

Appellant acknowledges Sgt. Bremigen's testimony, at the omnibus pretrial hearing and during trial, that Betts had not discussed a confession. *Id.* at 24. He argues that "permitting [] Betts to testify caused severe prejudice to [Appellant] in violation of his right to due process." *Id.* at 25.

The law governing such claim is well settled:

> In **Brady**, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. The Supreme Court subsequently held that the duty to disclose such evidence is applicable even if there has been no request by the accused, and that the duty may encompass impeachment evidence as well as directly exculpatory evidence. Furthermore, the prosecution's **Brady** obligation extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution.

**Commonwealth v. Lambert**, 884 A.2d 848, 853-54 (Pa. 2005) (internal citations and quotations omitted).

There are three necessary components for a meritorious claim that the Commonwealth violated due process rights by failing to disclose **Brady** material: "the evidence was favorable to the accused, either because it is exculpatory or because it impeaches; the evidence was suppressed by the prosecution, either willfully or inadvertently; and prejudice ensued." **Commonwealth v. Conforti**, 303 A.3d 715, 726 (Pa. 2023) (emphasis added) (quoting **Lambert**, 884 A.2d at 854).

In its opinion denying post-sentence motions, the trial court concluded Appellant failed to establish prejudice resulting from any nondisclosure:

- 16 -

The presentation of [] Betts as a witness was not so prejudicial as to violate [Appellant's] due process rights. The Commonwealth asked her about her prior *crimen falsi* convictions for unsworn falsification. Any attack on her credibility was available to the defense at the trial. [Appellant] shifts to [Betts's] credibility in relation to her testimony that later in the evening of the incident the Defendant admitted that "he stabbed somebody in the face." The testimony was as follows:

> Q. [The Commonwealth:] The night of the stabbing, what, if any, admissions did [Appellant] make in your apartment?
>
> A. [Betts:] He told me when he got there, that he ---there was a fight, and that he believed at the time that he had stabbed somebody in the face, is what he had admitted to me. But, I found out, obviously, later that was not the case.

On cross-examination, [Betts] was asked if she recalled telling the police about that statement, and she said she did. The police video and audio recording of her statement[, made to police two days after the incident,] was lost before it could be made available to either side. The investigating officer did not include in his report that any "confession" was made to this witness. On this limited exchange, [Appellant] asserts that the Commonwealth ran afoul of the requirement of pretrial disclosure under [***Brady***]. [The trial court] does not see how the "result of [the] proceeding would have been different" if the initial statement to the police had been preserved. ***Commonwealth v. Gibson***, 951 A.2d 1110[, 1127] (Pa. 2008) ….

Trial Court Opinion, 1/11/24, at 2-3.

We agree with the sound reasoning of the trial court. We further observe that at trial, Sgt. Bremigen's testimony contradicted the testimony of Betts. Sgt. Bremigen confirmed his police report was a contemporaneous summary of what Betts said during the interview. N.T., 6/12/23, at 110. According to Sgt. Bremigen, that report included no statement, by Betts, about Appellant's purported confession. ***Id.*** Sgt. Bremigen specifically

testified Betts did not inform him of a confession by Appellant. ***Id.*** This testimony, coupled with the evidence described above, confirms Appellant suffered no prejudice resulting from the admission of Betts's testimony.

Finally, Appellant argues that the trial court erred in applying the deadly weapon enhancement at sentencing. Appellant's Brief at 25. Application of the deadly weapon enhancement implicates the discretionary aspects of Appellant's sentence. Such a challenge is not appealable as of right. ***Commonwealth v. Moury***, 992 A.2d 162, 170 (Pa. Super. 2010). In order to reach the merits of a discretionary sentencing issue, we must conduct a four-part analysis to determine:

> (1) whether the appeal is timely; (2) whether [Appellant] preserved his issue; (3) whether [Appellant's] brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence [in accordance with [Pa.R.A.P. 2119(f)]; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the [S]entencing [C]ode.... [I]f the appeal satisfies each of these four requirements, we will then proceed to decide the substantive merits of the case.

***Commonwealth v. Colon***, 102 A.3d 1033, 1042-43 (Pa. Super. 2014) (citation omitted).

Here, Appellant has satisfied the first three factors of ***Colon***. Further, this Court has found that application of the deadly weapon enhancement presents a substantial question. ***See Commonwealth v. Kneller***, 999 A.2d 608, 613 (Pa. Super. 2010) (stating a challenge to the application of the deadly weapon enhancement implicates the discretionary aspects of

- 18 -

sentencing). Therefore, we will address the merits of Appellant's sentencing claim.

Appellant argues the court erred in applying the deadly weapon enhancement because there was no finding he possessed a deadly weapon in the commission of any offense. Appellant's Brief at 25. Appellant argues,

> [t]he court could not make such a finding as [Appellant] was acquitted of all counts related to the possession and/or use of a deadly weapon by the jury; all witnesses present at the scene testified consistently that they did not see [Appellant] with a knife; and all witnesses testified that [Appellant] remained five feet away from the victim during the altercation. The mere proof that a stabbing occurred and [Appellant] was present is not sufficient evidence to suggest that [Appellant] used a deadly weapon in the commission of a crime. A conspirator or accomplice cannot lawfully be sentenced utilizing the deadly weapon enhancement.

*Id.* at 26 (citation omitted; punctuation modified).

Our standard of review of a sentencing claim is as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing court, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion, which in this context, is not shown merely to be an error in judgment; rather[,] the appellant must establish by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Shull*, 148 A.3d 820, 832 (Pa. Super. 2016).

The deadly weapon enhancement applies when a defendant uses a deadly weapon during the commission of the offense. 204 Pa. Code § 303.10(a)(2). The factual findings triggering an enhancement of the suggested minimum sentence under section 303.10 require proof by a

- 19 -

preponderance of the evidence. ***Commonwealth v. Ellis***, 700 A.2d 948, 959 (Pa. Super. 1997); ***see also Commonwealth v. Healey***, 494 A.2d 869 (Pa. Super. 1985) (stating that possession of a deadly weapon for purposes of the deadly weapon enhancement may be proved by circumstantial evidence).

Here, the trial court found, by a preponderance of the evidence, that Appellant used a deadly weapon during his aggravated assault of Banghart:

> Based upon the evidence, it was established by the Commonwealth, by a preponderance of the evidence, that [Appellant] used a deadly weapon, *i.e.*[,] a knife, while in the commission of the aggravated assault upon the victim. There were surveillance videos of the attack that showed [Appellant] lunging at the victim with an arching arm movement directly at him, who sustained knife wounds to his shoulder and stomach. Later, [Appellant] was at an apartment placing a knife in cleaning solution and ma[de] a statement that he "caught him pretty good." Under the preponderance of the evidence standard, there was a determination of the court that the deadly weapon enhancement did apply in this matter.

Trial Court Order, 1/17/24, at 4. We discern no error or abuse of the trial court's discretion.

We further observe that in ***Commonwealth v. McKeithan***, 504 A.2d 294 (Pa. Super. 1986), this Court concluded that evidence that the victim suffered a severe cut on the neck, during a fight with defendant, was sufficient to support a finding that defendant possessed a deadly weapon for purposes of the deadly weapon enhancement. ***Id.*** at 299. This Court made that determination despite the fact that no one saw the defendant use a weapon, and no weapon was ever found. ***Id.*** Similar to this case, "[t]he fact that the device or instrumentality employed by [Appellant] in committing the

aggravated assault was fortuitously not seen or found will not allow him to escape the application of the weapon enhancement to his sentence." ***Id.*** For the same reason, Appellant's challenge to application of the deadly weapon enhancement merits no relief. Accordingly, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>10/25/2024</u>